STATE OF FLORIDA          )
                          )   SS          5:11mj75-LB
COUNTY OF BAY             )

## AFFIDAVIT

I, Michael H. Clear, being duly sworn, deposes and states as follows:

## I.   PRELIMINARY MATTERS

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations, execute warrants, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been employed as a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA) since March 2005. I am currently assigned to the Panama City Resident Office in DEA's Miami Field Division. I am authorized under federal law to investigate, execute warrants, and make arrests for violations of the Controlled Substance Act and to perform other law enforcement duties as authorized by law.  Before becoming a DEA Special Agent, I worked for the Grand Junction Police Department in Grand Junction, CO for over seven years.  There, I functioned as a uniform police officer and Narcotics Detective. During my tenure, I also functioned as a Task Force Officer with the Drug Enforcement Administration.   Over the last 13 years of my law enforcement career, I have received over one thousand (1000) hours in specialized training that focused on methods of unlawful drug trafficking; the means by which drug traffickers and/or manufacturers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.  In connection with my official DEA duties, I investigate criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, Sections 1952, 1956, and 1957.

3.      The information contained in this Affidavit is based on my personal knowledge and on information that I have learned from Special Agents and Task Force Agents of the DEA, Bureau of Alcohol, Tobacco, Firearms, & Explosives, the Bureau of Immigration and Customs Enforcement, and the Florida Department of Law Enforcement, as well as investigators with the Jackson County Sheriff's Office; from information provided by a confidential sources; and from review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court order authorizing the interception of wire communications.   Since this Affidavit is being submitted for the limited purposes of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

4.      This Affidavit is made for the purpose of establishing probable cause in support of an Amended Criminal Complaint, charging Rufino ROBELO-GALO; Lee Parker BUSSEY,

JR.; Frank Eben GULLETT, JR.; Jack Allen KELLY; Cora Rebecca STONE; Rowdy Dewayne GILBERT; Mary Ann BREWER; Christopher D. GULLETT; Bobby Jene KENT; Soul BARRAGON; Ricardo Heredia BARRON; Nestor Jose HERNANDEZ-ESTRADA; Jesus CADENAS-BAEZ; Octavio GONZALEZ-FLORES; and Juan Jose CADENAS-BAEZ with a violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

## II.   OVERVIEW OF CONSPIRACY

7.    Since approximately the fall of 2010, law enforcement has been investigating a drug-trafficking organization based in Jackson County, Florida and led by Lee Parker BUSSEY, JR. ("the BUSSEY organization").    The investigation has revealed that the BUSSEY organization is supplied multi-pound quantities of methamphetamine by a drug organization operating out of Georgia and South Carolina and that the methamphetamine is brought from the Atlanta, Georgia area to BUSSEY by couriers driving vehicles with concealed compartments. The investigation has further revealed BUSSEY distributes the methamphetamine to others in Jackson County, who further distribute the methamphetamine.

8.    The following is a brief summary of the roles each co-conspirator played in the conspiracy and the paragraphs in this Affidavit pertaining to each:

### Suppliers

a.    Rufino ROBELO-GALO is the primary methamphetamine supplier for the BUSSEY organization. *See* Paragraphs 90-139, 141-153, 163-214, 220, 221.

b.    Jesus CADENAS-BAEZ controls the methamphetamine supply and arranges for the transportation of methamphetamine from the Atlanta, Georgia area to ROBELO-GALO in Jackson County.  *See* Paragraphs 184-205.

### First-Tier Distributor

c.    Lee Parker BUSSEY, JR. is the head of the BUSSEY organization. BUSSEY receives methamphetamine from ROBELO-GALO and distributes it to others in Jackson County for further distribution. *See* Paragraphs 11, 36-87, 90-139, 141-210, 215-216, 220.

### Second-Tier Distributors

d.    Frank Eben GULLETT, JR. receives methamphetamine from BUSSEY and distributes it to others for further distribution.  *See* Paragraphs 13, 19-21, 28-30, 36-78, 140, 154-162, 215, 217, 220, 222.

e.    Jack Allen KELLY receives methamphetamine from BUSSEY and distributes it to others for further distribution. *See* Paragraphs 22-27, 31-35, 215, 218, 220.

      f.    Mary Ann BREWER receives methamphetamine from BUSSEY and distributes it to others for further distribution. *See* Paragraphs 79-87, 215, 220.

### Third-Tier Distributors

      g.    Cora Rebecca STONE receives methamphetamine from GULLETT and distributes it to others for personal use. *See* Paragraphs 29, 46-78, 88, 140, 215.

      h.    Rowdy Dewayne GILBERT receives methamphetamine from GULLETT and distributes it to others for personal use. *See* Paragraphs 36-78, 215, 219, 222.

      i.    Christopher D. GULLETT receives methamphetamine from Frank Eben GULLETT and distributes it to others for personal use. *See* Paragraphs 46-78, 89, 140, 154-162, 215, 222.

### Drug Couriers/Workers

      j.    Soul BARRAGON is a drug courier for ROBELO-GALO and JESUS CADENAS-BAEZ, who transports methamphetamine from the Atlanta, Georgia area to Jackson County, Florida. *See* Paragraphs 117-139, 141-153, 163-169.

      k.    Ricardo Heredia BARRON is a drug courier for ROBELO-GALO and Jesus CADENAS-BAEZ, who transports methamphetamine from the Atlanta, Georgia area to Jackson County, Florida. *See* Paragraphs 177-183.

      l.    Nestor Jose HERNANDEZ-ESTRADA is a drug-and-money courier for ROBELO-GALO, who transports the methamphetamine within Jackson County, Florida to BUSSEY's residence and drug proceeds within Jackson County, Florida from BUSSEY's residence. *See* Paragraphs 117-139, 141-153, 163-169, 170-214, 221.

      m.    Bobby Jene KENT is one of BUSSEY's workers, who distributes BUSSEY's methamphetamine to BUSSEY's drug customers at BUSSEY's request. *See* Paragraphs 98, 116, 154-162, Footnotes 9-10, 215, 220.

      n.    Octavio GONZALEZ-FLORES is a drug courier for ROBELO-GALO and Jesus CADENAS-BAEZ, who transports methamphetamine from the Atlanta, Georgia area to Jackson County, Florida. *See* Paragraphs 211-214, 221.

      o.    Juan Jose CADENAS-BAEZ is a drug courier for ROBELO-GALO and Jesus CADENAS-BAEZ, who transports methamphetamine from the Atlanta, Georgia area to Jackson County, Florida. *See* Paragraphs 198, 211-214, 221.

## III.    <u>OVERVIEW OF THE INVESTIGATION</u>

### A.    <u>Confidential Sources</u>

9.    Historical information about the organization has been provided by two

confidential sources ("CS-1 and CS-2").

1.     **Confidential Source-1**

10.     Confidential Source 1 ("CS-1") has a criminal history that includes arrests for methamphetamine, cocaine, marijuana, traffic offenses, and a probation violation. CS-1 provided information to law enforcement in hopes that CS-1 would not be charged with Distribution/Sell of Methamphetamine. Currently, CS-1 is no longer cooperating with law enforcement.

11.     In or about August 2010, CS-1 cooperated with law enforcement and provided information about the BUSSEY organization. CS-1 provided the following information relative to the BUSSEY organization operating in the Jackson County, Florida area. This information has been corroborated and has proven reliable by consensual tape recordings, information provided by other cooperating witnesses, physical surveillances, and telephone toll records. The information provided by CS-1 about the BUSSEY organization is based upon CS-1's first-hand knowledge. CS-1 told law enforcement that:

a.     He/she has known BUSSEY for approximately twenty years and has been actively involved in BUSSEY'S organization in the Jackson County, Florida area for the past three (3) to four (4) years, since BUSSEY'S release from federal prison. CS-1 stated that BUSSEY was distributing between two (2) to three (3) pounds of methamphetamine per month during this time period. CS-1 stated that, over the past 1 ½ years, BUSSEY has increased the amount of methamphetamine that he was acquiring and distributing to between one to two pounds per week. CS-1 indicated that BUSSEY typically distributes between fifteen (15) and twenty (20) ounces of methamphetamine on Thursday and Friday nights and that he does so from BUSSEY'S residence, which is highly guarded by lookouts.[1]

b.     CS-1 stated that BUSSEY has been purchasing the methamphetamine from an unknown Hispanic male in Alabama. CS-1 stated he/she has been present on several occasions when the unknown Hispanic male has delivered methamphetamine to BUSSEY'S residence. CS-1 stated he/she has assisted BUSSEY on several occasions to repackage pound quantities of methamphetamine into smaller quantities for further distribution. CS-1 further assisted BUSSEY in counting quantities of U.S. currency ranging between $40,000.00 and $60,000.00, for payment for multiple pound quantities of methamphetamine. Furthermore, CS-1 stated BUSSEY buries his drug proceeds on his property in Marianna in an effort to conceal it from law enforcement's detection and from other drug trafficker's detection. CS-1 stated that, on one occasion in early 2010, he/she helped BUSSEY bury approximately $60,000.00 in drug proceeds on BUSSEY'S property.

c.     CS-1 has personally observed and distributed methamphetamine on behalf of BUSSEY during the last three to four years. Additionally, CS-1 stated he/she has observed multiple weapons at BUSSEY'S residence, ranging from handguns to rifles for the protection in furtherance of the distribution of methamphetamine.

---

[1] Based on your Affiant's training and experience in the investigation of Drug Trafficking Organizations similar to the BUSSEY organization, a lookout is a common technique used by drug traffickers to detect the presence of law enforcement when distributing controlled substances.

### 2.    Confidential Source-2

12.    Confidential Source 2 ("CS-2") has a criminal history that includes arrests for possession of methamphetamine, traffic offenses, trespassing, larceny theft, burglary, under age possession of alcohol, aggravated battery, and contracting without license. CS-2 provided information to law enforcement in hopes that he/she would not be charged with Possession of Methamphetamine. CS-2 has recently been arrested for dealing in stolen property, and CS-2 is currently incarcerated and is no longer cooperating with law enforcement.

13.    In or about December, 2010, CS-2 cooperated with law enforcement and provided the following information relative to the BUSSEY organization. The information provided by CS-2 about the BUSSEY organization has been corroborated and has proven reliable through two controlled purchases of methamphetamine, video and audio recordings, information provided by other cooperating witnesses, physical surveillances, and telephone toll records. The information provided by CS-2 about the BUSSEY organization is based upon firsthand knowledge or statements made by GULLETT to CS-2.

       a.    CS-2 stated he/she has known GULLETT between six (6) to seven (7) months. CS-2 stated he/she was introduced to GULLETT through a mutual friend - STONE, whom he/she has known for approximately 1 ½ years. CS-2 stated that GULLETT is employed at a warehouse for a bread company. CS-2 stated GULLETT has a bread-delivery route and supplies bread to several local stores in the Jackson County, Florida area.   CS-2 stated he/she became aware of GULLETT's involvement into the distribution of methamphetamine through STONE. CS-2 stated that STONE purchases methamphetamine from GULLETT on a regular basis and that CS-2 was present on two different occasions when STONE purchased between two and three grams of methamphetamine from GULLETT. CS-2 stated that STONE is a user of methamphetamine, but also further distributes small quantities of methamphetamine. CS-2 stated STONE is currently unemployed.

       b.    CS-2 stated GULLETT has told him/her during previous conversations over the last six to seven months that his source of supply for methamphetamine is BUSSEY and that BUSSEY further utilizes a "Mexican" source in the Northern District of Florida and a secondary source, known only as "Pedro," in the Middle District of Alabama. CS-2 stated that GULLETT has told him/her that he distributes between six to eight ounces of methamphetamine per week. CS-2 believes GULLETT has been distributing this amount of methamphetamine for several months. CS-2 stated he/she has seen GULLETT on one occasion in possession of multiple ounces of methamphetamine at STONE's residence in late November or earlier December 2010.  CS-2 stated he/she has had no contact with BUSSEY and CS-2's only knowledge of BUSSEY is through previous conversations with GULLETT and other associates of the BUSSSEY organization.   CS-2 believes BUSSEY distributes the bulk of the methamphetamine acquired through his sources in the Jackson County, Florida area.

### B.    The Wiretap Investigation

14.    On January 27, 2011, the Honorable Richard Smoak, United States District Court for the Northern District of Florida, signed an order authorizing the interception of wire

communications over **Target Telephone 1**, which was being used GULLETT.  Interception of **Target Telephone 1** commenced on January 27, 2011 and terminated on February 25, 2011.

15.     On February 10, 2011, the Honorable Richard Smoak, United States District Court for the Northern District of Florida, signed an order authorizing the interception of wire communications over **Target Telephone 2**, which was being used by BUSSEY.  Interception of **Target Telephone 2** commenced on February 10, 2011 and terminated on March 11, 2011.

16.     On March 2, 2011, the Honorable Richard Smoak, United States District Court for the Northern District of Florida, signed an order authorizing the interception of wire communications over **Target Telephone 1**, which was being used by GULLETT.  Interception of **Target Telephone 1** commenced on March 2, 2011 and terminated on March 18, 2011.

17.     On April 14, 2011, the Honorable Richard Smoak, United States District Court for the Northern District of Florida, signed an order authorizing the interception of wire communications over **Target Telephone 3**, which was being used by Rufino ROBELO-GALO. Interception of **Target Telephone 3** commenced on April 15, 2011 and terminated on May 13, 2011.

### C.     Seizures

18.     The investigation has resulted in six methamphetamine seizures and one money seizure.  They include the following:

a.      On December 6, 2010, CS-2 made a controlled purchase of 4.4 grams of methamphetamine from GULLETT in Jackson County, Florida;

b.      On December 7, 2010, CS-2 made a controlled purchase of 13.5 grams of methamphetamine from KELLY in Jackson County, Florida;

c.      On December 8, 2010, CS-2 made a controlled purchase of 28.2 grams of methamphetamine from GULLETT in Jackson County, Florida;

d.      On December 15, 2010, CS-2 made a controlled purchase of 5.4 grams of methamphetamine from KELLY in Jackson County, Florida;

e.      On February 14, 2011, law enforcement seized approximately one ounce of methamphetamine from BREWER in Panama City, Florida; and

f.      On March 11, 2011, law enforcement seized approximately 16 grams of methamphetamine from GULLETT in Jackson County, Florida.

g.      On May 16, 2011, law enforcement seized approximately $60,000.00 from a vehicle driven by ROBELO-GALO in Phenix City, Alabama.

h.      On May 21, 2011, law enforcement seized: (1) approximately six pounds

of methamphetamine and several ounces of marijuana from a vehicle driven by GONZALEZ-FLORES in tandem with vehicles driven by ROBELO-GALO and Juan CADENAS-BAEZ; (2) approximately $30,000 from the Stash House occupied by ROBELO-GALO and HERNANDEZ-ESTRADA;[2] (3) approximately one-half of a pound of methamphetamine and a small amount of marijuana from BUSSEY; (4) approximately $15,000 from BUSSEY;[3] (5) approximately 20 grams of methamphetamine from KELLY; (6) approximately 2 grams of methamphetamine from GULLETT; and (7) approximately one-quarter of a gram of methamphetamine from GILBERT.

## IV.    METHAMPHETAMINE TRAFFICKING

### A.    Controlled Purchases by CS-2[4]

#### 1.    December 6, 2010: Purchase of Methamphetamine by CS-2 from GULLETT

19.     On or about December 6, 2010, at the direction and control of law enforcement, CS-2 made a recorded call to GULLETT to arrange the purchase of a quantity of methamphetamine from GULLETT.

20.     Law enforcement then searched CS-2 and CS-2's vehicle with negative results, and CS-2 was equipped with a video-recording device.  CS-2 then went to a gas station in Jackson County, Florida, where CS-2 met with GULLETT.  During the meeting, CS-2 purchased $250 worth of methamphetamine.  CS-2 provided GULLETT with $300.  However, GULLETT did not have change, so CS-2 and GULLETT agreed that the remaining $50 would be credited towards the next purchase of one ounce of methamphetamine later in the week.

---

[2] Law enforcement seized two bundles that were wrapped in cellophane.  One was labeled to indicate that it contained $15,000. The other was not labeled, but was slightly larger than the labeled bundled. Law enforcement will take the bundles to the bank for an official count, but your affiant's estimate is that both bundles contained a total of $30,000.

[3] This too is an estimation, and an official bank count will be done to determine the precise amount.

[4] For each recorded call referenced in this section, the call was placed at the direction of and under the control of law enforcement.   Additionally, the summaries of the recorded conversations reference in this section are based on a review of these recordings and/or draft, not final, transcripts.  The summaries do not include all of the topics discussed during the conversations. During the recitation of calls or in-person meetings, I have placed in brackets my understanding of the conversation which is based on, where applicable, CS-2's understanding of the conversation, my understanding of the conversation or code word used, the context and content of the entire conversation, and/or the investigation as a whole. In addition, for all recorded calls listed in this affidavit made to or from CS-2's telephone, the number called or being called was verified by telephone toll records or by agents who were present when the telephone call was made or received with the exception of text messaging. Moreover, where the language used during some of the consensually-recorded conversations summarized in this affidavit was Spanish. Spanish speaking agents and/or linguists have listened to the calls and translated the conversations into English.

21.     The purchased methamphetamine was transferred to the Florida Department of Law Enforcement ("FDLE") Crime Laboratory for further analysis and safekeeping.  According to the FDLE Crime Laboratory Report, the substance is 4.4 grams of methamphetamine.

### 2.     December 7, 2010: Purchase of Methamphetamine by CS-2 from Jack KELLY

22.     On December 7, 2010, law enforcement met with CS-2, who stated that he/she had spoken with KELLY earlier that day and arranged to purchase one ounce of methamphetamine for $1,800.  These calls were not recorded or made in the presence of law enforcement, but are corroborated by telephone toll records for KELLY's telephone.

23.     Law enforcement then searched CS-2 and CS-2's vehicle with negative results, and CS-2 was equipped with a video-recording device.  CS-2 then met with KELLY in Cottondale, Florida at approximately 1:32 p.m.  During this meeting, CS-2 gave KELLY $900 for a half ounce of methamphetamine.  KELLY did not have the methamphetamine and had to travel to pick it up.  KELLY then departed the area.

24.     According to telephone toll records on both KELLY's and BUSSEY's telephones, KELLY contacted BUSSEY at approximately 2:12 P.M.

25.     Surveillance saw KELLY depart the meeting, driving a black Nissan Pickup Truck bearing Florida registration A29-4PQ ("KELLY's Nissan Truck").  Surveillance followed KELLY to the area of BUSSEY's residence, which is on Mill Creek Lane in Marianna.[5]

26.     At approximately 3:29 p.m., surveillance observed KELLY return to CS-2's location in Cottondale, Florida, driving KELLY's Nissan Pickup Truck.  There, KELLY met with CS-2 and provided CS-2 with approximately one half ounce of methamphetamine.

27.     The purchased methamphetamine was transferred to the FDLE Crime Laboratory for further analysis and safekeeping.  According to the FDLE Crime Laboratory Report, the substance is 13.5 grams of methamphetamine.

### 3.     December 8, 2010: Purchase of Methamphetamine by CS-2 from GULLETT

28.     On or about December 8, 2010, law enforcement met with CS-2, who stated that CS-2 has made arrangements to meet with GULLETT at GULLETT'S residence, located in Marianna, Florida, to purchase one ounce of methamphetamine for $1,800.  These calls were not recorded or made in the presence of law enforcement.  However, they are corroborated by

---

[5] BUSSEY's residence is on a dead-end dirt road with approximately three residences on the street. Because of the remote and dead-end nature of Mill Creek Lane, ground surveillance cannot set up directly on BUSSEY's residence. However, because Mill Creek Lane is a dead-end street, there is only one entrance and exit from the street and that is at the intersection of Mill Creek Lane and Baker Creek Road. As a result, surveillance is able to set up close to the intersection of Mill Creek Lane and Baker Creek Road.  When surveillance is able to follow a person close to this intersection, I have stated in this affidavit that surveillance followed the person "to the area of BUSSEY's residence."

telephone toll records for Target Telephone 1, which was used by GULLETT.

29.     Law enforcement then searched CS-2 and CS-2's vehicle with negative results, and CS-2 was equipped with a video-recording device. Law enforcement then followed CS-2 to GULLETT's residence. CS-2 then met with GULLETT, and during this meeting, CS-2 gave GULLETT $1800, and GULLETT provided CS-2 with the methamphetamine. Also during this meeting, CS-2 told GULLETT that CS-2 may need more methamphetamine. GULLETT replied, "Ok, let me know…Or tell Becca or something I mean…" [CS-2 to call GULLETT or Cora Rebecca STONE if CS-2 needs additional methamphetamine].

30.     The purchased methamphetamine was transferred to the FDLE Crime Laboratory for further analysis and safekeeping. According to the FDLE Crime Laboratory Report, the substance is 28.2 grams of methamphetamine.

### 4.     December 15, 2010: Purchase of Methamphetamine by CS-2 from KELLY

31.     On December 15, 2010, law enforcement met with CS-2. At approximately 11:07 A.M., CS-2 placed a recorded telephone call to KELLY. During this call, CS-2 and KELLY agreed to meet in Cottondale, Florida to arrange for the purchase of methamphetamine.

32.     Law enforcement then searched CS-2 and CS-2's vehicle with negative results, and CS-2 was equipped with a video-recording device. CS-2 then drove to Cottondale and met with KELLY. During the meeting, KELLY asked CS-2 what he/she wanted. CS-2 stated "400" [$400 worth of methamphetamine] and gave KELLY $400. KELLY then asked CS-2 if CS-2 wanted KELLY to leave CS-2 a "22", referring to a .22 caliber weapon, which CS-2 declined.

33.     Ground surveillance then observed KELLY depart the area in KELLY's Nissan Truck. Surveillance followed KELLY to the area of BUSSEY's residence. Aerial surveillance followed KELLY and saw him arrive at BUSSEY'S residence at 3996 Mill Creek Lane, Marianna, Florida ("BUSSEY's residence") at approximately 12:21 P.M. At approximately 1:15 P.M., aerial surveillance saw KELLY depart BUSSEY'S residence.

34.     Ground surveillance then followed KELLY from BUSSEY's residence back to Cottondale, Florida, where KELLY met with CS-2. During this meeting, KELLY gave CS-2 the methamphetamine.

35.     The purchased methamphetamine was transferred to the FDLE Crime Laboratory for further analysis and safekeeping. According to the FDLE Crime Laboratory Report, the substance is 5.4 grams of methamphetamine.

### B.     Intercepted Conversations over Target Telephone 1[6]

---

[6] Unless otherwise noted, voice identification of the speakers is based on, among other things, the following. First, agents and monitors have been able to consistently identify voices on each call because their voices have been intercepted numerous times. Second, during particular intercepted calls, participants arranged to meet with each other or others, and those meetings were surveilled by agents and officers, who compared driver's license photographs of the persons to confirm their identity. Or officers with the Jackson County Sheriff's Office know or

1.   **January 28-29, 2011:  Sale of Methamphetamine from BUSSEY to GULLETT and from GULLETT to GILBERT**

36.   On January 28, 2011, at approximately 3:32 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call GILBERT, using telephone number (850) 557-9341 (Call 174).   During the call, GULLETT stated, "This shit I got ain't no good, it's the bottom of the sack" [the methamphetamine that GULLETT has is of bad quality].   GILBERT replied, "It's that bad?"  GULLET said, "Yeah, well you had it this morning."  GILBERT said, "Shhh."  GULLETT stated, "I mean I, I tried to a ha, ha to get up with him, but he said it be for me to come by in the morning."   [GULLETT tried to obtain additional methamphetamine from BUSSEY, but BUSSEY told GULLETT to see BUSSEY for additional methamphetamine the next morning].   GULLETT stated, "You done all yours" [did GILBERT sell all the poor-quality methamphetamine], and GILBERT said, "well I fucking didn't get shit off man" [the quality was so poor that GILBERT did not make much money on the methamphetamine].

37.   On January 29, 2011, at approximately 10:06 A.M., BUSSEY, using **Target Telephone 2**, made a telephone call to GULLETT on **Target Telephone 1** (Call 261).   During the telephone call, GULLETT said, "Hey I'm up here at ah McDaniel's and ah be there after I work this here…ah probably by 11:30" [GULLETT will be at BUSSEY's residence probably around 11:30 A.M. to purchase methamphetamine].  BUSSEY said, "Ok".

38.   At approximately 12:19 P.M., surveillance followed GULLETT to the area of BUSSEY's residence.   Aerial surveillance observed GULLETT depart BUSSEY's residence at approximately 1:00 P.M.

39.   At approximately 1:34 P.M., GULLETT, using **Target Telephone 1,** made a telephone call to GILBERT at telephone number (850) 557-9341 (Call 305).   During the telephone call, GULLETT stated, "It's gone be about three o clock" [GULLETT will be able to deliver methamphetamine to GILBERT about 3:00 P.M.].   GILBERT said, "10-4 yeah he done called me one time already" [One of GILBERT's methamphetamine customers already called GILBERT for methamphetamine].   GILBERT said, "Like I say, I've met him over at her house several times before" [GILBERT has sold methamphetamine to the customer several times before].    GULLETT replied, "Yeah he's cool" [GULLETT trusts GILBERT's customer].   GILBERT said, "I mean he's been cool with me every time you know" [The drug customer has not given GILBERT a reason not to trust him].   GULLETT asked, "Where's, Where's he you going over there, or he coming over here" [Where will GILBERT sell the methamphetamine to the customer].  GILBERT stated, "No, he's coming over here . . ." [The drug customer will meet GILBERT at GILBERT's location].   GULLETT asked, "Oh what time…what time is he coming" [What time will the drug customer meet GILBERT].   GILBERT stated, "He trying to hold off until I call or until I hear from whoever . . . So I'll call him back right now and tell him that it is going to be around three" [GILBERT will call the drug customer to tell him that GILBERT should have methamphetamine, which he will get from GULLETT, around 3:00 P.M.].

---

have had contact with the speaker and have been able to identify the voice.

40.     On January 29, 2011, at approximately 2:45 P.M., GULLETT, using **Target Telephone 1,** made a telephone call to GILBERT at telephone number (850) 557-9341 (Call 313).  During the telephone call, GULLETT stated, "Hey I got it, but it's …I'm down here in Grand Ridge. I got to go do these stops. I got to get them done before three…four" [GULLETT has methamphetamine available for GILBERT, but he still working].  GILBERT replied, "Alright."  GULLETT said, "Umm then I will head that way" [GULLETT will finish work before meeting with GILBERT to supply him with methamphetamine]. GILBERT replied, "Ok."

41.     At approximately 4:29 P.M., GULLETT, using **Target Telephone 1,** made a telephone call to GILBERT at telephone number (850) 557-9341 (Call 341).  During the telephone call, GILBERT stated, "Oh Bobo, he is already here to, she just called and said he's here.  He's trying to hang out as long as he can". [GILBERT's customer "Bobo" is waiting for GULLETT to arrive at GILBERT'S residence to deliver a quantity of methamphetamine]. GILBERT later stated, "They ain't going to be here man, fuck no. I was waiting for you to get here, so I can call him, tell him to come…" [No additional people will be at GILBERT's residence when GULLETT delivers the methamphetamine, and GILBERT will call the customer to pick up the methamphetamine after GULLETT arrives]. GILBERT stated, "Alright man, you headed this way?"  GULLETT replied, "Yeah."

42.     Surveillance then followed GULLETT to GILBERT's residence in Marianna, Florida.

43.     At approximately 4:53 P.M., GULLETT, using **Target Telephone 1,** made a telephone call to GILBERT at telephone number (850) 557-9341 (Call 353).  During the telephone call, GULLETT stated, "Hey big shaq, I'm out here" [GULLETT is at GILBERT's residence with the methamphetamine].  GILBERT replied, "Oh, you already outside?" GULLETT stated, "Yeah."  GILBERT stated, "Mother Fucker… you ain't getting out are you?" GULLETT replied, "I can't I gotta go" [GULLETT is not getting out of vehicle, so GILBERT must come outside to get the quantity of methamphetamine].

44.     At the same time, approximately 4:53 P.M., surveillance observed GULLETT arrive and park in front of GILBERT's residence.  Approximately a minute later, surveillance observed a male walk from the direction of GILBERT's residence to GULLETT's Ford Truck, get into the passenger side of GULLETT's Ford Truck, and then exit GULLETT's the truck and walk towards the residence. GULLETT then left the area.

45.     At approximately 4:58 P.M., GULLETT, using **Target Telephone 1,** received a call from GILBERT from telephone number (850) 557-9341 (Call 355).  During the call, GILBERT stated, "You better smoke with me man, cause gollee" [GILBERT wants GULLETT to use a controlled substance with GILBERT].  GULLETT asked, "What?" GILBERT replied, "That is fucking pretty man, than one" [the controlled substance that GULLETT gave GILBERT is of good quality].  GULLET stated, "That's yours…I put that in there extra" [GULLETT put some extra methamphetamine in what he gave GILBERT for GILBERT's personal use].

11

2.   **February 9-12, 2011: Sale of Methamphetamine from BUSSEY to GULLETT and from GULLETT to STONE and GILBERT**

46.    On February 9, 2011, at approximately 8:11 A.M., GULLETT, using **Target Telephone 1**, made an outgoing call to Christopher GULLETT at telephone number (850) 693-4094 (Call 2181). During the call, GULLETT asked Christopher GULLETT to "stop by Rowdy's and get my clocks" [go to GILBERT's and get GULLETT's scales]. Christopher GULLETT stated, "Oh, I don't want to go by there I mean." GULLETT said, "Alright (overlapping voices) I'm gone eye ball it two grams" [GULLETT will estimate two grams of methamphetamine]. Christopher GULLETT said, "That's all you got," and GULLETT replied, "Ah I got more I don't know if I want to get rid of it though" [GULLETT had additional quantities of methamphetamine, but does not want to sell it all]. Christopher GULLETT said, "Alright um shoot, he'll, he'll want to fucking tag along he called me last night wanted to come get me I'm like shhh he knows I got money he knows I got blow and..." [Christopher GULLETT does not want Rowdy GILBERT to go with him because GILBERT knows Christopher GULLETT has money and cocaine].

47.    At approximately 10:28 A.M., GULLETT, using **Target Telephone 1**, received an incoming call from STONE from telephone number (850) 557-5490 (Call 2210). During the call, GULLETT stated, "Where you want to go?"  STONE said, "Um anywhere, you got anything to burn?" [Does GULLETT have any controlled substances they can smoke]. GULLETT replied, "Yeah." They agreed to meet at STONE'S aunt's residence. STONE further stated that she had a friend with her and asked GULLETT if that was ok. GULLETT said, "Ok yeah." STONE said, "She's, she's cool" [GULLETT can trust STONE's friend].

48.    At approximately 12:07 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE at telephone number (850) 557-5490 (Call 2227). During the call, GULLETT said, "So whatcha, what you sayin." STONE said, "Huh, if you um you know whenever" [STONE wants to purchase additional quantities of methamphetamine]. GULLETT stated, "I got to have the money baby" [GULLETT has to collect money from STONE before he can obtain additional amounts of methamphetamine]. STONE replied, "I told you I've got it" GULLETT told STONE he would call her when he leaves Cottondale, and STONE said, "That will work."

49.    At approximately 2:03 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to Rowdy GILBERT at telephone number (850) 557-9341 (Call 2242). During the call, GILBERT said, "You coming by here first?" [Is GULLETT going to come over to drop off a quantity of methamphetamine first]. GULLETT replied, "I ain't been by there" [GULLETT has not been to Lee BUSSEY'S residence to obtain additional quantities of methamphetamine]. GILBERT replied, "Man...fuck (laughs) alright".

50.    At approximately 2:14 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to Rowdy GILBERT at telephone number (850) 557-9341 (Call 2249). During the call, GILBERT stated, "So what's your want me to do, You just want me to tell her just don't worry about it?" [Should GILBERT tell his drug customer to wait]. GULLETT replied, "Yeah, just tell her to wait cause I got to get some money, and I ain't going over there twice"

[GULLETT is not going to go see Lee BUSSEY more than once to get additional amounts of methamphetamine until GULLETT collects all of the money for methamphetamine he has out on consignment].

51.   At approximately 2:34 P.M., GULLETT, using **Target Telephone 1**, received an incoming call from STONE from telephone number (850) 557-5490 (Call 2257). During the call, GULLETT said, "Alright um shit. I ain't been over there yet..." [GULLETT has not been to BUSSEY'S residence to obtain additional amounts of methamphetamine].  STONE stated, "Ok well um I guess I'm a um a just bring you this stuff papers money" [STONE will bring GULLETT money for methamphetamine].  GULLETT asked, "Alright how much is it?" STONE replied, "I don't know you tell me." GULLETT stated, "Well what's you wantin?" [how much methamphetamine does STONE want]. STONE said, "Um...I don't know, can you ah meet me to get it?" [Can GULLETT meet STONE to collect her money]. GULLETT stated, "Ahh yeah where at?"  STONE said at "Cross Ministries by Swearington." GULLETT asked STONE again how much it was, and STONE asked GULLETT to repeat it.  GULLETT said, "I mean you don't know how much you got?"  STONE replied, "Yeah I know what I got, but I don't know what..." After laughing together, STONE stated, "I don't know what's you want," and GULLETT replied, "Whatever you got!"

52.   At approximately 2:44 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE at telephone number (850) 557-5490 (Call 2258). During the call, STONE said she was coming into Greenwood, and GULLETT replied, "Alright....Ten-Four...um whatcha looking for I mean you tell me" [How much methamphetamine does STONE want]? STONE stated, "Um one or two," and GULLETT repeated, "One or two?"  STONE said, "Yeah" [STONE wants one to two of an unknown quantity of methamphetamine]. GULLETT said, "Uh alright well I don't know if I'll be able to go today though" [GULLETT may not have the time to go to BUSSEY to get methamphetamine for STONE]. STONE stated, "That's fine." GULLETT continued saying, "I mean it'll probably be tomorrow cause I'm waitin to get some more money" [GULLETT has to collect additional amounts of money before he goes to Lee BUSSEY'S to obtain additional quantities of methamphetamine]. STONE stated, "Take my money and go to, do the damn thang fuck all the rest." GULLETT said, "Ha ha." STONE said, "Tell him it's for me." STONE then asked GULLETT where he was, and where they were going to meet. GULLETT said he was leaving his residence.  They agreed to meet on a dirt road by Popular Springs Highway in Jackson County.

53.   At approximately 2:57 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE at telephone number (850) 557-5490 (Call 2263). During the call, GULLETT stated, "Um, I'm going to have to wait until tomorrow." STONE acknowledged. STONE asked GULLETT, "You still wanting my um..." GULLETT said, "Yeah" [STONE is asking GULLETT if he still wants to meet to collect her money].  STONE asked GULLETT if he wanted to meet her down Popular Springs on the dirt road, and GULLETT said they could.

54.   At approximately 3:24 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE at telephone number (850) 557-5490 (Call 2270). During the call, GULLETT stated, "...you know you, you getting a deal." STONE replied, "Yeah, I mean...um did you think I was not happy?" GULLETT said, "Uhh, I did you happy." GULLETT stated,

"I'll call you when I get after I do the damn thing tomorrow" and STONE acknowledged [GULLETT will call STONE after he meets with BUSSEY and obtains additional amounts of methamphetamine]. STONE stated, "You'll ship it um you'll know by I don't know what you do or how you do or whatever but..." GULLETT said, "Huh, you don't know what I do?" STONE stated, "You don't know I don't know how much or whatever, but if it don't look all that good or something...you don't got to get all of it, but if it is good do it" [If the quality of the methamphetamine that GULLETT gets from BUSSEY is good, STONE wants GULLETT to get the entire amount STONE requested].

55.     On February 10, 2011, at approximately 8:11 A.M., GULLETT, using **Target Telephone 1**, made an outgoing call to Christopher GULLETT at telephone number (850) 693-4094 (Call 2359). During the call, GULLETT stated, "Oh, alright. Wanting anything today" [Does Christopher GULLETT want any methamphetamine]? Christopher GULLETT said, "Umm, I don't know. I don't know. I still got some of that" [Christopher GULLETT still methamphetamine]. GULLETT replied, "Oh do you?" Christopher GULLETT said, "I'll let you know." GULLETT said, "10-4" and explained that he had to help a co-worker and "then I am going to go see him" [GULLETT will get methamphetamine from BUSSEY after he helps a co-worker]. GULLETT stated, "If you want anything, just let me know" [If Christopher GULLETT wants any methamphetamine to let GULLETT know]. Christopher GULLETT stated, "Let me check and see how much money I got" [Christopher GULLETT will decide if he needs any more methamphetamine after he counts his money].

56.     At approximately 10:18 A.M., GULLETT, using **Target Telephone 1**, made an outgoing call to Christopher GULLETT at telephone number (850) 693-4094 (Call 2385). During the call, GULLETT said, "Oh alright, alright uh I'm going to get something [methamphetamine from BUSSEY], but I'm just getting enough for me."

57.     At approximately 10:32 A.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE, at telephone number (850) 557-5490 (Call 2395). During the call, GULLETT said, "I'm trying to get up a little more money before I go over there. I'm fixin to go over there" [GULLETT is collecting as much money as he can before he meets with BUSSEY to obtain methamphetamine]. STONE replied, "Ok." GULLETT stated, "You gonna have that tomorrow you said" [Is STONE going to have the money owed to him], and STONE stated, "Yep." GULLETT stated, "Ok, alright 10-4 I'll see if I can just pay him tomorrow" [GULLETT will ask BUSSEY if he can pay him the remaining money the following day]. As the conversation progressed, GULLETT suggested that they meet the same place as they did the day before, which STONE agreed. STONE said "Yeah, the sooner the better." GULLETT said he had to run to Wal-Mart and then he was "headed that way." STONE thanked GULLETT and GULLETT said, "And I'll call you when I leave there" [GULLETT will call STONE after he obtains more methamphetamine from BUSSEY so they can meet].

58.     Following this call with STONE, agents on surveillance saw GULLETT'S vehicle at the Wal-Mart in Marianna.

59.     At approximately 10:46 A.M., GULLETT, using **Target Telephone 1**, made an outgoing call to BUSSEY, at telephone number **Target Telephone 2** (Call 2399). During the

call, GULLETT asked BUSSEY want he was doing and further stated, "Ok, um I was fixin to ride over if that's alright?" BUSSEY said, "Yeah," GULLETT acknowledged and said "I'll see you bye" [GULLETT is going to see BUSSEY to obtain methamphetamine].

60.     At approximately 10:49 A.M., GULLETT, using **Target Telephone 1**, received an incoming call from GILBERT, from telephone number (850) 557-9341 (Call 2400). During the call, GULLETT stated, "Alright, well I ain't been over there yet" [GULLETT has not been to BUSSEY'S residence to obtain more methamphetamine]. GILBERT replied, "Oh, you ain't been over there yet?" GULLETT said, "No I'm fixin to." As the conversation progressed, GILBERT stated, "Alright man...what about 30 to 45 minutes" [Can GULLETT deliver methamphetamine to GILBERT in 30-45 minutes]. GULLETT said, "Yeah."

61.     At approximately 10:59 P.M., agents observed GULLETT's vehicle turn north onto Union Road. Agents did not follow GULLETT due to the remote area and to avoid law enforcement detection, but monitored GULLETT's vehicle through a GPS tracking device on GULLETT'S vehicle.

62.     Agents continued to monitor the GPS device on GULLETT's vehicle, which showed that GULLETT's vehicle then traveled to BUSSEY's residence, that the vehicle arrived at BUSSEY's residence at approximately 11:05 A.M., and that it left BUSSEY's residence at approximately 11:52 A.M.

63.     Ground surveillance then followed GULLETT directly to a mobile home, where based upon intercepted calls, agents believe GULLETT was meeting with GILBERT and others.

64.     At approximately 12:07 P.M., approximately the same time as he arrived at this mobile home, GULLETT, using **Target Telephone 1**, made an outgoing call to STONE, at telephone number (850) 557-5490 (Call 2412). During the call, GULLETT stated, "Oh, ok um about 1:30? That be fine?" STONE said, "Yeah" and that she would call GULLETT at "About 1:00." [GULLETT is going to meet with STONE at approximately 1:30 P.M. to give her a methamphetamine he picked up from BUSSEY].

65.     At approximately 1:14 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE, at telephone number (850) 557-5490 (Call 2422). During the call, GULLETT said, "Ah, bee-line fixing to swing by the house, and I'll be down there" and STONE acknowledged [GULLETT was to stop by his house and then meet STONE to deliver the methamphetamine].

66.     The GPS tracking device on GULLETT'S vehicle showed that he arrived at his residence at approximately 1:18 P.M and departed his residence at approximately 1:26 P.M. Ground surveillance then followed GULLETT to a very remote area off Popular Springs Road.

67.     At approximately 1:35 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE, at telephone number (850) 557-5490 (Call 2428). During the call, GULLETT said, "Hey, where you at?" STONE said, "Where you? I'm here." GULLETT replied, "Alright I'm coming I'm right down the road," and STONE acknowledged.

68.     According to the GPS tracking device on GULLETT's vehicle, GULLETT's vehicle stopped on a dirt road on Spring Cemetery Road just off Popular Springs Road in Jackson County, Florida at approximately 1:37 P.M. and left the area at approximately 1:59 P.M. Based on the calls and tracking information, your affiant believes that GULLETT met with STONE while stopped.

69.     At approximately 2:00 P.M., surveillance observed a white four-door passenger vehicle driving southbound on Popular Springs Road. Agents followed the white passenger vehicle believed to be STONE. Surveillance observed a white female driving the vehicle, however the windows were tinted too dark for him to positively identify STONE. Surveillance observed that this vehicle had Florida license plate H04-9ZW, which according to Florida Department of Motor Vehicles records is registered to STONE. Agents followed the vehicle to the area of STONE's residence and terminated surveillance.

70.     At approximately 5:06 P.M., GULLETT, using **Target Telephone 1**, made an outgoing call to STONE, at telephone number (850) 557-5490 (Call 2480). During the call, STONE stated, "Uhm, I had somebody here and they asked me for something you know" [STONE had a customer asking her for methamphetamine], and GULLETT said, "Yeah".

71.     On February 12, 2011, at approximately 1:08 P.M., GULLETT, using **Target Telephone 1,** received an incoming call from GILBERT at telephone number (850) 557-9341 (Call 2918). During the call, GILBERT said, "In the china, when I get there I'll hand you them scales. I know right where there at." GULLETT stated, "Yeah, I know where mine are" [GULLETT is going to pick up his scales].

72.     At approximately 3:04 P.M., GULLETT, using **Target Telephone 1,**   received an incoming call from GILBERT at telephone number (850) 557-9341 (Call 2966). During the call, GILBERT stated, "Hey man fuck that texting shit listen to me I'm just fixing to send you these texts he just sent me see exactly what I need, so I did need to fucking try and keep explain shit to you and all that crap" [GILBERT did not want to explain to GULLETT via text messaging that he need a quantity of methamphetamine for a customer]. GULLETT replied, "You, what you want?" GILBERT said, "Because he is wanting two of them, now he is wanting two of them he just sent me a text message. I'll send it to you..." GULLETT said, "Don't send them to me." GILBERT stated, "Ohh how you want to do this because you no...(U/I)...you ain't your going to be able to get out (U/I)..and it is impossible to get up with your ass and you know I ain't exactly sure exactly what time it's supposed to..." GULLETT said, "We'll see." GILBERT stated, "I hate to tell him to come all the way down here just for that" [GILBERT did not want his methamphetamine customer coming the distance unless GULLETT had more methamphetamine to provide to GILBERT]. GILBERT said, "He is coming all the way down here for just two of them things" GULLETT stated, "Well, if that's all he wants that's all he gets. What's you talking about?" GILBERT said, "Two of them... two little ones." GULLETT acknowledged. GILBERT stated, "Are you sure your going to be able to break away when he gets here," and GULLETT said, "Yeah" [GULLETT will deliver GILBERT a quantity of methamphetamine once GILBERT'S customer arrives].

73. At approximately 3:21 P.M., GULLETT, using **Target Telephone 1,** made an outgoing call to Christopher GULLETT at telephone number (850) 693-4094 (Call 2977). During the call, Christopher GULLETT stated, "Alright, ah, um, how much, what are you doing?" [How much methamphetamine can GULLETT get]. GULLETT replied, "What you got yesterday" [the same amount GULLETT gave Christopher GULLETT the day before]. Christopher GULLETT stated, "Alright can you go drop it off at my house and I'll…take you the cash? I'll take you the cash as soon as I get home. You hear me…(U/I)…going, going, to go by my house or what" [Christopher GULLETT will bring the money for the methamphetamine to GULLETT after he gets home].

74. At approximately 5:28 P.M., GULLETT, using **Target Telephone 1,** made an outgoing call to GILBERT at telephone number (850) 557-9341 (Call 3018). During the call, GULLETT stated, "Um yaw can either take a ride or I can get Chris to bring it to you" [GILBERT can either meet GULLETT somewhere or Christopher GULLETT can bring methamphetamine to GILBERT]. GILBERT replied, "No, I'll take a ride." GULLETT stated, "Well you are going to have to ride to his house," and GILBERT asked, "to Chris?" GULLETT said, "Yeah" [GULLETT is going to leave methamphetamine for GILBERT at Christopher GULLETT's residence for GILBERT to pick up]. GILBERT asked GULLETT when he needed to head to Christopher GULLETT's residence, and GULLETT replied, "I'll, I don't know. I mean I will leave it somewhere, out there for you. They wanted one huh?" [GULLETT will leave the methamphetamine at Christopher GULLETT'S residence and is asking GILBERT if his customer wanted one, referring to the quantity]. GILBERT said, "Two," and GULLETT replied, "Two G's." GILBERT replied, "Two." GULLETT stated, "Two big ones." GILBERT replied, "Dos, yes sir." GULLETT asked, "Two yards?" GILBERT replied, "Yes sir." GULLETT acknowledged [GULLETT and GILBERT were speaking in code referring to the quantity of methamphetamine GILBERT's customer wanted to purchase]. GILBERT said, "I just trying to figure out what I need to do about getting you your bread. I'll have it as soon as he gets here. He have the bread soon as he gets here, that ain't no problem." [GILBERT will have GULLETT's money for the methamphetamine after GILBERT's customer arrives]. GILBERT told GULLETT to call him in the morning, and he would bring "it" [money] to GULLETT. GULLETT stated, "I'll call you, I am fixin to go by there then I'll call you" [GULLETT is going to deliver GILBERT's methamphetamine to Christopher GULLETT's residence and then GULLETT will call GILBERT to let him know the methamphetamine is there].

75. At approximately 5:45 P.M., GULLETT, using **Target Telephone 1,** received an incoming call (Call 3023) from GILBERT at telephone number (850) 557-9341. During the call, GULLETT said, "Chris has got it" [GULLETT gave the methamphetamine to Christopher GULLETT for GILBERT to pick up]. GILBERT stated, "Oh, fuck, alright." GULLETT stated, "He ain't going to mess with it man" [GULLETT is assuring GILBERT that Christopher GULLETT will not take any of the methamphetamine destined for GILBERT]. GILBERT said, "Alright" and "Are you sure?" GULLETT stated, "Yes, I'm sure, huh I'm sure man."

76. At approximately 5:47 P.M., surveillance saw GULLETT at Christopher GULLETT's residence at 5113 Smith Street in Greenwood, Florida ("Christopher GULLETT's residence").

77.    At approximately 6:18 P.M., surveillance set up at GILBERT's residence in Marianna, Florida ("GILBERT's residence") saw GILBERT exit his residence and enter a Ford Truck, which was parked in the front yard.  Surveillance followed the Ford Truck directly to Christopher GULLETT'S residence, where it arrived at approximately 6:41 P.M.

78.    At approximately 6:54 P.M., surveillance saw GILBERT's Ford Truck depart Christopher GULLETT'S residence and followed the truck directly back to GILBERT'S residence.

### 3.    February 14, 2011: Sale of Methamphetamine from BUSSEY to BREWER and the Arrest of BREWER

79.    On February 13, 2011, at approximately 10:07 P.M., BUSSEY, using **Target Telephone 2**, received an incoming call from Mary Ann BREWER at (850) 441-4644 (Call 148). This telephone call was not answered by BUSSEY and went to BUSSEY'S voice mail box. BREWER did not leave a voice mail message.

80.    On February 13, 2011, at approximately 10:43 P.M., BUSSEY, using **Target Telephone 2**, made an outgoing call to BREWER at (850) 441-4644 (Call 154).  During the call, BUSSEY said, "I'll be here in the morning."  BREWER responded, "Ok, um probably about 6:00 or a little earlier."  BUSSEY stated, "About 6:00?"  BREWER responded, "Is that ok?"  [Can BREWER can come by BUSSEY's residence about 6:00 in the morning to purchase methamphetamine].  Later in the call, BUSSEY stated, "I'll be here."

81.    At approximately 10:51 P.M., BUSSEY, using **Target Telephone 2**, made an outgoing call (call 157) to Mary Ann BREWER at (850) 441-4644.  During the call, BUSSEY said, "Make it 6:30."  BREWER stated, "Ok."  BUSSEY responded, "and I will be here then."  BREWER responded, "Ok" [BREWER should not to go to BUSSEY's residence on February 14, 2011 until 6:30 in the morning].

82.    Based on the aforementioned intercepted calls on **Target Telephone 2**, law enforcement initiated surveillance on February 14, 2011 at approximately 4:40 A.M. in the immediate area of BREWER's residence located at 3705 Sherrett Drive, Southport, Florida ("BREWER's residence").

83.    At approximately 4:40 A.M., law enforcement observed a gold Pontiac Grand Prix, ("Pontiac"), bearing Florida registration 446-LNT turn left off of Sherrett Drive in Southport. According to the Florida Driver and Vehicle Information Database, this Pontiac was registered to Mary A. Brewer at BREWER's residence. Aerial surveillance followed the vehicle to BUSSEY'S residence, where the vehicle arrived at approximately 6:48 A.M. and departed at approximately 7:37 A.M. Aerial surveillance saw the vehicle travel back towards Panama City, Florida.

84.    Agents had previously made contact with a Florida Highway Patrol (FHP) Trooper and requested the FHP Trooper to attempt a traffic stop on the vehicle in Bay County, Florida.  The FHP Trooper ran BREWER through NCIC, which revealed BREWER'S

license was expired as of August 27, 2010 and an active warrant for her arrest out of Biloxi, Mississippi for Larceny. Additionally, law enforcement observed that the BREWER's vehicle had passenger side rear brake light that was not working.

85.     At approximately 8:24 A.M., the FHP Trooper pulled BREWER over in Bay County and ultimately arrested on the active warrant.

86.     During the traffic stop, a K-9 Trooper conducted an exterior sniff of the BREWER's vehicle with his certified K-9 partner. The police K-9 indicated and alerted to the odor of narcotics emitting from within the vehicle.

87.     A probable cause search of BREWER's vehicle was conducted, and during the search, law enforcement found approximately one ounce of a substance that field-tested positive for methamphetamine in a clear plastic bag in the closed portion of the center console between the driver and passenger front seats. Additionally, troopers found a multi patterned brownish zippered bag (similar to a change purse) between the front driver's seat and the center console of the vehicle. There were multiple items in this bag one of which is a smoking pipe which appeared to be used to ingest controlled substances.

4.     **February 25, 2011:  Calls Regarding Sales of Methamphetamine from GULLETT to STONE and CHRISTOPHER GULLET**

88.     On February 25, 2011, at approximately 11:27 A.M., GULLETT, using **Target Telephone 1**, received an incoming call from STONE, using telephone number (850) 557-5490 (Call 5325). During the call, STONE said, "Did you understand that did you?"  GULLETT replied, "7.7."  STONE said, "No um right when you meet me in a minute to pick up this money."  GULLETT stated, "Uh huh."  STONE replied, "I was going to see if you had any you could give me right then like .7 or, or (Overlapping voices)."  GULLETT stated, "7 tenths (Overlapping voices)."  STONE replied, "Or whatever, huh?"  GULLETT stated, "you talking about 7 tenths?"  STONE replied, "Yeah."  GULLETT stated, "Oh, ok."  STONE replied, "Cause ah my buddy friend wanted ah um a half you know and I was like wanting a bowl for myself" [GULLETT and STONE are going to meet, and STONE is going to give GULLETT money for methamphetamine.  But STONE wants .7 grams of methamphetamine right away while GULLETT before GULLETT gets the rest from BUSSEY because STONE had someone who wants to purchase a half gram (.5 grams) of methamphetamine from STONE and STONE wants .2 grams of methamphetamine to smoke]. GULLET stated, "Um how much you want me, how much you wanting?"  STONE said, "Oh yeah I'm wanting ah my usual."  GULLETT stated, "Ok, the two."  STONE replied, "Not, yeah, yeah."  GULLETT stated, "The ok 450."  STONE replied, "Yeah" [STONE wanted what STONE usually purchases, two "8 balls" or approximately 7 grams for $450].

89.     On February 25, 2011, at approximately 11:46 A.M., GULLETT, using **Target Telephone 1**, received an incoming call from Christopher GULLETT, using telephone number (850) 693-4094 (Call 5331). During the call, Christopher GULLETT stated, "… Can I give you 120?  How much do you got now …130 and ah she's got to go by the bank and run a few errands, so it's going to take her, it's up to you, so." [Christopher GULLETT's customer has to

get money to pay for methamphetamine that Christopher GULLETT will get from GULLETT]. Christopher GULLETT stated, "I am going to get it to you before, before, lunch. The rest of it before lunch." [Christopher GULLETT will make a partial payment of $130 for methamphetamine provided on consignment and agreed to pay the rest before].

### 5. Thursday, February 17, 2011: The Identification of ROBELO-GALO and the Delivery of Methamphetamine from ROBELO-GALO to BUSSEY

90.    On February 16, 2011, at approximately 12:30 P.M., BUSSEY, using **Target Telephone 2**, received an incoming call from telephone number (850) 579-4907, which is subscribed to person ("Individual A") (Call 273). During the call, "Can you bring me some when you come" [Will BUSSEY bring Individual A a quantity of methamphetamine when he comes to meet Individual A]? BUSSEY stated, "Ah, a little bit, at the moment I ain't got any, but I'll do somethin'" [BUSSEY is very low on his methamphetamine supply and only has smaller amounts available]. Individual A stated, "Ok, that'll be good."

91.    At approximately 1:25 P.M., BUSSEY, using **Target Telephone 2**, made an outgoing call to an unknown male at telephone number (850) 326-1774, for which the subscriber is unknown (Call 280). During the call, the unknown male stated, "You do anything" [Does BUSSEY have any methamphetamine available for sale]? BUSSEY replied, "No, won't be until tomorrow." BUSSEY said, "I'll give you a holler" [BUSSEY will call the unknown male after he receives his shipment of methamphetamine].

92.    Based on the February 16, 2011 calls set forth above, on February 17, 2011, at approximately 5:30 A.M., ground surveillance was established in the area of BUSSEY's residence to observe the anticipated delivery of methamphetamine to BUSSEY and to identify the person making the delivery.

93.    At 7:03 A.M., ground surveillance observed an individual, later identified in the traffic stop set forth below as ROBELO-GALO, driving a beige Nissan Truck, with Georgia license-plate number ATQ-0607 (the "beige Nissan truck"). Ground surveillance observed ROBELO-GALO turn into the area of BUSSEY's residence.

94.    At approximately 7:26 A.M., aerial surveillance observed the beige Nissan Truck leave BUSSEY's residence. Based on the calls set forth above and below and the surveillance, your affiant believes that ROBELO-GALO delivered methamphetamine to BUSSEY when he went to BUSSEY's residence.

95.    Ground surveillance followed the beige Nissan Truck directly to the Edgewood Apartments, Apartment J, located on Highway 90 East in Cypress, Florida (the "Stash House"), where it arrived at 7:57 A.M.

96.    When the beige Nissan Truck arrived, aerial surveillance observed ROBELO-GALO enter the Stash House. At the same time, ground surveillance observed a burgundy Toyota Truck, with South Carolina license-plate number CXG-473, also parked at the Stash House (hereinafter "burgundy Toyota Truck").

97.     At approximately 9:50 A.M., ground surveillance observed the burgundy Toyota Truck driving in Marianna and leave the area, headed north in the direction of South Carolina.

98.     At approximately 10:06 A.M., BUSSEY using **Target Telephone 2** made an outgoing call to telephone (850) 447-2211, for which the subscriber is unknown (Call 357). During the call, this unknown male asked BUSSEY how he was doing, and BUSSEY replied, "Pretty good Bobby's at, Bobby's at the house, he'll take care of you" [KENT is at BUSSEY's house and will sell the unknown male methamphetamine.. The unknown male told BUSSEY he was "coming up there."[7]

99.     At approximately 1:02 P.M., a Harris County, Georgia Sheriff's Deputy, conducted a traffic stop on the burgundy Toyota Truck. The passenger was identified through a South Carolina driver's license and a U.S. Department of Homeland Security Employment Authorization Card, as ROBELO-GALO, whose address was listed on the driver's license as being in Greenville, South Carolina.

100.    The deputy learned through speaking with the occupants that they had departed South Carolina on or about February 16, 2011 and traveled to Florida, only to return several hours after arriving. The deputy questioned the driver outside the presence of ROBELO-GALO. The driver stated that he and ROBELO-GALO had traveled to an unknown location in Florida to buy auto parts. The deputy then spoke with ROBELO-GALO, who stated that he and the driver had traveled to an unknown location in Florida to see family members.

101.    After the deputy interviewed both occupants he asked them for consent to search the vehicle, and both consented. During an initial search no illegal items were found. An assisting deputy, who is a certified K-9 handler, then conducted a free air sniff of the vehicle, which resulted in a positive alert near the rear end of the vehicle. During the search, deputies looked in the diamond plated tool box located in the bed of the truck. On the driver's side of the tool box, deputies found a telephone receipt for the telephone number (770) 334-4877, which as set forth below has been identified as belonging to BUSSEY ("BUSSEY's supplier phone").[8]

---

[7]  In addition, on February 25, 2011, at approximately 5:10 P.M., BUSSEY, using **Target Telephone 2**, received an incoming call from a male at telephone number (850) 227-6457 (Call 790). During the call, they greeted each other, and BUSSEY asked where the male was. The male said he was fixing to get off I-10 and BUSSEY replied, "Ok, I'm shit, I'm in Panama. When you get to my house tell Bobby to call me on the phone. Give him your phone, he aint got one." The male said, "Ok is he at your house?" BUSSEY said Yeah, yeah he's there, he's the guy that works for me." The male said he would be at BUSSEY's residence in 30-45 minutes [BUSSEY directed the male to give his phone to Bobby KENT upon his arrival and that KENT would distribute a quantity of methamphetamine to the male at BUSSEY'S direction because KENT worked for BUSSEY].

[8]  On March 29, 2011, United States Magistrate Judge Larry Bodiford issued a court order authorizing agents to obtain geo-location data (GPS) on cellular telephone (770) 334-4877. The GPS information on telephone number (770) 334-4877 at various times has precisely placed this telephone at BUSSEY's Residence.  As a result, your affiant believes that (770) 334-4877 is the telephone that BUSSEY uses to contact ROBELO-GALO.

6.    **Thursday, February 24, 2011: Delivery of Methamphetamine**
      **From ROBELO-GALO to BUSSEY and BUSSEY's Distribution by**
      **KENT**

102.    On February 22, 2011, at approximately 4:30 P.M., BUSSEY, using **Target Telephone 2**, received an incoming call from an unknown male at telephone number (850) 447-2211 (Call 618).  During the call, BUSSEY and the unknown male greeted each other.  During the call, the unknown male stated, "I was going to head that way probably in about twenty minutes if, if, it was convenient." [Is it convenient to stop by BUSSEY's residence to get methamphetamine].  BUSSEY replied, "There is nothing shaking right at the moment, just some of the (Overlapping Voices)."  [BUSSEY did not have any methamphetamine to sell the unknown male]. The unknown male stated, "How about when will it be shaking?  In the morning" [Will BUSSEY have methamphetamine the next morning]?   BUSSEY, replied, "Maybe I hope so."

103.    On February 23, 2011, at approximately 7:42 P.M., BUSSEY, using **Target Telephone 2**, made an outgoing call to an unknown female at telephone number (850) 530-9565 (Call 674).  During the call, BUSSEY stated, "I got um, I got meet someone early in the morning."  The unknown female replied, "When are you coming back?"  BUSSEY stated, "When am I coming back.  I'll be here tonight, but I mean I just, I gotta be, I can't miss it." [BUSSEY is going to meet with BUSSEY'S methamphetamine supplier and obtain a quantity of methamphetamine early in the morning at BUSSEY'S residence].  As the call progressed, the unknown female stated, "Ok, can I go with you?"  BUSSEY replied, "No huh huh (Laughing). . . Yeah, Yeah, one of them things. . . It's already in motion" [BUSSEY needs to be alone to meet his methamphetamine supplier].

104.    At approximately 5:10 P.M., surveillance observed ROBELO-GALO arrive at the Stash House driving the burgundy Toyota Truck.  ROBELO-GALO went inside the Stash House.

105.    The next morning, on February 24, 2011 at approximately 5:30 A.M., surveillance observed the beige Nissan Truck and burgundy Toyota Truck parked at the Stash House.  At 6:18 A.M., surveillance realized that parked behind the beige Nissan Truck was a blue Nissan Truck, with Georgia license-plate number ABI3192 (the "blue Nissan Truck").

106.    At approximately 6:18 A.M., two individuals walked from the front-door area of the Stash House, got into the blue Nissan Truck, and departed the area.  Because of the way the Stash House is positioned on Highway 90, surveillance could not be established in an area that allows for a direct view of the Stash House door.  However, there are no other doors in the immediate area, so most every time that surveillance observed an individual go to or depart from the front-door area of the Stash House, it appeared that the individual entered or exited the Stash House.  As a result, your affiant believes that the two individuals exited the Stash House before entering the blue Nissan Truck.

107.    Surveillance followed the two individuals directly to the Executive Inn, located at 4113 Lafayette Street, Marianna, Florida, where it appeared they checked into the motel to and

then went to a motel room for, what law enforcement believes was to, rest after couriering methamphetamine overnight into the area for ROBELO-GALO. Law enforcement did not pull the hotel records to attempt to identify these individuals for fear that hotel employees could compromise the investigation.

108.    At approximately 6:28 A.M., surveillance saw ROBELO-GALO walk from the front-door area of the Stash House wearing a jacket and get into the beige Nissan Truck. Because of the dimness of the morning and the surveillance location, surveillance could not tell whether ROBELO-GALO was carrying anything.

109.    Telephone records for **Target Telephone 3** show that on February 24, 2011, at approximately 7:05 A.M., **Target Telephone 3**, received an incoming call from BUSSEY's supplier phone, but the duration was 0 seconds.

110.    Surveillance followed ROBELO-GALO in the beige Nissan to the area of BUSSEY's residence.

111.    Aerial surveillance saw the beige Nissan Truck at BUSSEY's residence at approximately 7:08 A.M. and saw it leave BUSSEY's residence about ten minutes later. Ground surveillance followed the beige Nissan Truck back to the Stash House, where surveillance saw ROBELO-GALO exit the beige Nissan Truck and walk to the front-door area of the Stash House at approximately 8:04 A.M.  While driving back to the Stash House, ROBELO-GALO took an indirect route, taking side streets and dirt roads, which indicated to law enforcement that he was conducting counter-surveillance.

112.    At approximately 9:00 A.M., surveillance saw ROBELO-GALO walk out of the Stash House carrying a trash bag and throw the bag into a community dumpster before returning to the Stash House.

113.    At approximately 10:00 A.M., ROBELO-GALO got into the burgundy Toyota Truck at the Stash House.  Surveillance followed ROBELO-GALO from Marianna to Interstate 10, where he headed eastbound and out of the area, at which point surveillance terminated.

114.    As soon as ROBELO-GALO was out of the immediate area, law enforcement seized the trash bag thrown into the dumpster by ROBELO-GALO and inside found: (1) clear plastic wrappings, some of which were molded into a rectangular shape, consistent with money and/or drug wrappings;  (2) handwritten notes with the numbers 2800, and 27.960, which are consistent with the price of a kilogram of methamphetamine ($28,000) and therefore the notes appeared to be a drug ledger; and (3) a rental receipt for the residence in the name "Tony Rovelo," the last name of which is similar to ROBELO.

115.    Aat approximately 12:34 P.M., BUSSEY, using **Target Telephone 2**, received an incoming call from an unknown male at telephone number (850) 381-5450 (Call 701). During this call, BUSSEY stated, "Come on" [BUSSEY now had methamphetamine]. The unknown male replied, "Alright I am on my way."

116.   On February 25, 2011, at approximately 5:56 P.M., BUSSEY, using **Target Telephone 3,** received an incoming call from Theresa KENT at telephone (850) 209-9356 (Call 794).  During the call, Theresa KENT told BUSSEY to hold on and handed the phone to Bobby KENT.   BUSSEY stated, "Take care of Bunks brother." KENT replied, "Alright," and BUSSEY stated, "He's coming up, David you remember him." KENT replied, "Yeah." BUSSEY stated, "Ok, in my saddle pouches, that little bitty thing that hangs on the saddle horn."  KENT replied, "Yeah." BUSSEY responded, "There's two good ones in there so take it out of that" and KENT acknowledged. [BUSSEY is directing KENT to further distribute two ounces of methamphetamine to one of BUSSEY's drug customers].[9]

       **7.**       **Saturday, March 5, 2011: Delivery of Methamphetamine from BARRAGON to ROBELO-GALO and HERNANDEZ-ESTRADA to BUSSEY**

117.   In anticipation of another weekly delivery of methamphetamine, on March 4, 2011, surveillance was established at the Stash House at approximately 6:00 A.M., at which time surveillance saw the burgundy Toyota Truck and the beige Nissan Truck parked at the Stash House.

118.   At 8:09 A.M., surveillance observed ROBELO-GALO and an individual, identified at the time of arrest as set forth below as HERNANDEZ-ESTRADA, exit the front-door area of the Stash House, get into the burgundy Toyota Truck, and depart the area.

119.   Ground and aerial surveillance followed ROBELO-GALO and HERNANDEZ-ESTRADA directly to BUSSEY's residence, where ROBELO-GALO and HERNANDEZ-ESTRADA arrived at 8:39 A.M.

120.   At approximately 8:44 A.M., aerial surveillance observed the burgundy Toyota Truck leave BUSSEY's residence and eventually was followed back to the Stash House.

121.   At approximately 8:52 A.M., BUSSEY, using **Target Telephone 2,** received an incoming call from an unknown male at direct-connect telephone number 316010110020296 (Call 1304).  During the call, an unknown male stated, "I'm going to be ah, headed that way shortly." [The unknown male will soon go to BUSSEY's residence to get methamphetamine]. BUSSEY replied, "Save your gas, ah maybe tomorrow or maybe the next day.  They don't know for sure they had a little problem" [BUSSEY's methamphetamine supplier has been delayed, so BUSSEY will not be able to supply the unknown male that day]. The unknown male stated, "Oh they had a problem?"  BUSSEY replied, "Yeah it was on their end, it wasn't on my end and but ah I just, I'll call as soon maybe tomorrow or maybe the next day" [BUSSEY's source of supply – ROBELO-GALO - had a problem getting the methamphetamine, but BUSSEY expects ROBELO-GALO to supply him with methamphetamine the next day or the day after].

---

[9]   Additionally, on March 1, 2011, at approximately 2:14 P.M., BUSSEY, using **Target Telephone 2,** made an outgoing call to a male at telephone number (850) 381-5450 (Call 1084).  During the call, the male asked BUSSEY if he was around the house, and BUSSEY replied, "Ah yeah I ain't but Bobby's there." [BUSSEY is not there, but KENT is]. The male said, "Oh ok I'll go see him." [BUSSEY directed the male to see KENT to obtain methamphetamine from BUSSEY].

122.    Ground surveillance followed the burgundy Toyota Truck the Grocery Outlet, in Marianna, Florida, where ROBELO-GALO and HERNANDEZ-ESTRADA exited the vehicle and entered the Grocery Outlet at approximately 9:00 A.M.;

123.    While they were inside, law enforcement installed a GPS tracking device on the burgundy Toyota Truck.

124.    At approximately 9:17 A.M., ROBELO-GALO and HERNANDEZ-ESTRADA exited the Grocery Outlet and drove to the 6050 block of Highway 90, just west of Cypress, Florida, where they parked the burgundy Toyota truck, got out of the vehicle, went to a table at a roadside flea market, and examined what appeared to be a .22 caliber semi-automatic rifle. HERNANDEZ-ESTRADA then placed the rifle into the burgundy Toyota Truck, and ROBELO-GALO and HERNANDEZ-ESTRADA returned to the Stash House after 10:00 A.M.

125.    At approximately 3:49 P.M., BUSSEY, using **Target Telephone 2**, received an incoming call from an unknown male at telephone number (850) 527-4568 (Call 1346). During the call, BUSSEY told the unknown male, "Yeah it still ain't happening" [BUSSEY does not yet have methamphetamine to sell the unknown male]. The unknown male stated, "Still ain't ok...Ten-Four." BUSSEY replied, "I'll give you a holler tomorrow, I hope. . . If it not tomorrow it will be, I mean, one day this week. I don't know when" [BUSSEY will give the unknown male a call the following day, by which time BUSSEY hopes to have obtained methamphetamine from ROBELO-GALO, but if not the next day, BUSSEY will have it that week].

126.    On or about March 5, 2011, surveillance was established surveillance at the Stash House at approximately 6:10 A.M., at which time surveillance observed the burgundy Toyota Truck was parked beside the Stash House and the beige Nissan Truck was parked in front of the Stash House.

127.    At approximately 7:15 A.M., a white Jeep Cherokee and a gray Nissan Maxima four-door passenger car arrived at the Stash House, and the gray Nissan Maxima pulled past the driveway from east to west then backed into the driveway to the right of a burgundy Toyota Truck. The Nissan Maxima had Georgia license plate number BPU-3370 (the "Nissan Maxima").

128.    Immediately after the arrivals, surveillance observed ROBELO-GALO, an individual who verbally identified himself during the traffic stop set forth below as Soul BARRAGON, and two unknown Hispanic males standing near the Nissan Maxima.

129.    ROBELO-GALO removed a jack from the burgundy Toyota Truck, jacked up the rear end of the Nissan Maxima, and removed the right rear wheel.

130.    At approximately 8:16 A.M., ROBELO-GALO and BARRAGON continued working on the passenger side of the Nissan Maxima, before ROBELO-GALO, BARRAGON, and the two unknown Hispanic males walked to the front-door area of the Stash House. An

unknown male and ROBELO-GALO walked back out to the Nissan Maxima, and BARRAGON continued working on the right rear-tire area of the vehicle.

131.  At approximately 9:10 A.M., BARRAGON rubbed his hands on the grass, then rubbed his hands under the fender of the right rear-wheel well, then rubbed his hands on the gravel drive, then picked up a handful of gravel, brought it back to the wheel-well area, and rubbed in around the area.

132.  Approximately 6 minutes later, ROBELO-GALO squatted down and looked at the wheel-well area before returning towards the area in front of the Stash House.

133.  At approximately 9:27 A.M., one of the unknown males put the right rear tire back onto the Nissan Maxima.

134.  At approximately 9:47 A.M., surveillance observed BARRAGON in the Nissan Maxima depart the Stash House. Based on the sequence of events, law enforcement believes that BARRAGON is a drug courier and that the Nissan Maxima had a secret compartment used to conceal the methamphetamine for transportation.

135.  At approximately 10:00 A.M., surveillance observed HERNANDEZ-ESTRADA in the beige Nissan Truck and ROBELO-GALO in the burgundy Toyota Truck westbound in Marianna, Florida.

136.  At approximately 10:01 A.M., BUSSEY, using **Target Telephone 2**, received an incoming call from unknown female at telephone number (850) 630-7362 (Call 1377).  During the call, the unknown female stated, "Hey um me and Karen was going to ride out and see you for a few minutes if it's alright?"  [The unknown female and another female want to buy methamphetamine from BUSSEY].  BUSSEY stated, "No it ain't . Ah you have to wait a while. Waiting on someone to come by" [BUSSEY is waiting on ROBELO-GALO to supply him with methamphetamine]. The unknown female replied, "Oh ok...Alright Lee, just give us a call."

137.  At approximately 10:20 A.M., surveillance observed HERNANDEZ-ESTRADA turn into the area of BUSSEY's residence.  Surveillance followed ROBELO-GALO through the GPS tracking device, which showed that ROBELO-GALO stopped on Baker Creek Road, close to Mill Creek Lane. Based on the calls and surveillance, your affiant believes that HERNANDEZ-ESTRADA delivered methamphetamine to BUSSEY for ROBELO-GALO, while ROBELO-GALO provided counter –surveillance.

138.  At approximately 10:48 A.M., surveillance observed followed ROBELO-GALO in the burgundy Toyota truck and HERNANDEZ-ESTRADA in the beige Nissan truck from Union Road back to the stash house.

139.  At approximately 11:15 A.M., surveillance observed HERNANDEZ-ESTRADA in the beige Nissan truck arrive back at the Stash House.  A few minutes later, surveillance saw ROBELO-GALO in the burgundy Toyota truck arrive back at the Stash House.

8.   **March 8, 2011:  Call between GULLETT and Christopher**
     **GULLETT**

140.   On March 8, 2011, at approximately 4:52 P.M., GULLETT, using **Target Telephone 1,** made an outgoing call to Christopher GULLETT at telephone number (850) 693-0394, (Call 6560).  During the call, GULLETT stated, "You don't need nuttin" [GULLETT is inquiring if Christopher GULLETT needed any methamphetamine]?  Christopher GULLETT replied, "No um Becca come by and we got big one from her" [STONE sold Christopher GULLETT methamphetamine].  GULLETT replied, "Oh, alright, ten four, alright."

9.   **March 10, 2011: Delivery of Methamphetamine from BARRAGON to**
     **ROBELO-GALO and HERNANDEZ-ESTRADA to BUSSEY**

141.   On March 9, 2011, at approximately 2:04 P.M., the GPS tracking device on the burgundy Toyota Truck showed that the vehicle was traveling south on U.S. Highway 231 at the Alabama/Florida State line and traveled directly to the Stash House.

142.   Based on the GPS data and on the predictable weekly methamphetamine deliveries from ROBELO-GALO to BUSSEY, law enforcement set up surveillance on March 10, 2011 at the Stash House at approximately 6:00 A.M, and which time they observed the burgundy Toyota Truck and the beige Nissan Truck were parked at the Stash House.

143.   At approximately 7:00 A.M., the gray Nissan Maxima, driven by Soul BARRAGON, arrived at the Stash House and backed in between the burgundy Toyota Truck and the west side of the Stash House.

144.   BARRAGON exited the Nissan Maxima, and walked to the front-door area of the Stash House.  A few minutes later, BARRAGON walked back to the Nissan Maxima, and then ROBELO-GALO walked over to the burgundy Toyota Truck, removed a large jack, and carried the jack over to the back of the Nissan Maxima, where ROBELO-GALO placed the jack under the rear bumper area of the Nissan Maxima and started to raise the back of the Nissan Maxima at approximately 7:15 A.M.

145.   BARRAGON then removed the lug nuts from the rear passenger tire of the Nissan Maxima, while HERNANDEZ-ESTRADA stood out and watched;

146.   After BARRAGON removed the rear passenger tire from the Nissan Maxima, BARRAGON accessed a hidden compartment within the rear passenger wheel-well area and appeared to remove at least two dark-colored packages from the inside the rear passenger wheel-well area and placed the packages on the ground.

147.   ROBELO-GALO then bent over and picked up the packages and placed the packages underneath ROBELO-GALO's jacket, which occurred at approximately 7:37 A.M.

148.   ROBELO-GALO then went to the front-door area of the Stash House, where it appeared that he went inside, and HERNANDEZ-ESTRADA and then BARRAGON followed.

149.   At approximately 8:59 A.M., BARRAGON later walked back to the Nissan Maxima and put the rear passenger tire back on.

150.   At approximately 9:18 A.M., ROBELO-GALO and HERNANDEZ-ESTRADA got into the burgundy Toyota Truck and departed the Stash House with BARRAGON following behind in the Nissan Maxima.

151.   Later that evening, at approximately 6:18 P.M., surveillance saw ROBELO-GALO get into the burgundy Toyota Truck and HERNANDEZ-ESTRADA get into the beige Nissan Truck and depart the Stash House, where both Trucks stopped at a gas station before traveling directly to the area of BUSSEY's residence.

152.   At 6:48 P.M., surveillance followed the HERNANDEZ-ESTRADA to Union Road, where the beige Nissan truck turned into the area of BUSSEY's residence.   ROBELO-GALO also turned on Union Road, and the GPS tracking device on the burgundy Toyota truck showed that ROBELO-GALO took Union Road to Baker Creek Road, where he stopped close to Mill Creek Lane.   Based on this, your affiant believes that ROBELO-GALO was conducting counter-surveillance while HERNANDEZ-ESTRADA delivered methamphetamine to BUSSEY.

153.   At approximately 7:37 P.M., surveillance followed HERNANDEZ-ESTRADA in the beige Nissan truck and ROBELO-GALO in the burgundy Toyota truck to the Stash House, where they arrived at 7:58 P.M.

## 10.   March 11, 2011:  Sale of Methamphetamine from BUSSEY through KENT to GULLETT and GULLETT's Arrest

154.   On March 10, 2011, at approximately 1:02 P.M., GULLETT, using **Target Telephone 1,** made an outgoing call to Christopher GULLETT at telephone number (850) 693-4094 (Call 7018).   During the call, Christopher GULLETT said, "I just got something from Becca" [Christopher GULLETT just purchased methamphetamine from STONE]. GULLETT replied, "Oh ok, (Overlapping Voices) alright well I'm going to go over there in about fifteen minutes, twenty minutes, I'll be over there. I mean I got to go to him" [GULLETT has to go to BUSSEY later to obtain additional methamphetamine].

155.   At approximately 4:16 P.M., GULLETT, using **Target Telephone 1,** made an outgoing call to Christopher GULLETT at telephone number (850) 693-0394 (Call 6854). During the call, GULLETT said, "I'm headed there now, you better come on." Christopher GULLETT replied, "Alright, I'm ah...um...somebody to bring me some money right now. They should be any minute." [GULLETT is on the way to deliver methamphetamine to Christopher GULLETT, who is waiting on his drug customer to bring him some money].

156.   On March 11, 2011, at approximately 11:24 A.M., GULLETT, using **Target Telephone 1,** made an outgoing call to Christopher GULLETT at telephone number (850) 693-0394 (Call 6996).   During the call, Christopher GULLETT stated, "Alright. You going to be, be able to do something" [Is GULLETT able to supply Christopher GULLETT with a quantity of methamphetamine]? GULLETT said, "Huh? What?" and Christopher GULLETT asked again if

GULLETT was able to "do something." GULLETT replied, "Yeah, I got something now, watch you want?" Christopher GULLETT replied, "How much you got?" GULLETT said, "Ah, one and a half." Christopher GULLETT said, "Oh, I need more that." GULLETT responded, "Oh, let's see I got, three all together." Christopher GULLETT said, "I need an eight" [Christopher GULLETT needs an 8 Ball or 3.5 grams of methamphetamine]. GULLETT said, "Huh?" Christopher GULLETT repeated, "I need an eight." GULLETT said, "Ah, I can, I can ah, give you this one and a half and when I, I'm going over there after I leave the warehouse" [GULLETT can bring Christopher GULLETT 1 ½ grams of methamphetamine now and can bring the rest after he meets with BUSSEY]. GULLETT said, "It is up to you." Christopher GULLETT stated, "Yeah, um, yeah me and Brenda are wanting something too so…I need more than, more than eight actually" [Christopher GULLETT needs more than an 8 ball or 3.5 grams because he and a female wants some for personal use and the 8 ball is for further distribution]. GULLETT stated, "You got some money?" Christopher GULLETT said, "Yeah." GULLETT asked, "You want me to come by there now?" Christopher GULLETT said, "I guess."

157.   On March 11, 2011, at approximately 11:46 A.M., GULLETT, using **Target Telephone 1,** made an outgoing call to BUSSEY at telephone number (850) 557-4923 (Call 7000). During the call, GULLETT stated, "Hey, um, ah, are you going to be around about one, one fifteen?" BUSSEY replied, "Ah, I don't know. I'm not there now" [BUSSEY is not at home]. GULLETT asked BUSSEY what time he thought he may be back. BUSSEY said, "I don't know, I might be there, I might not. I really don't know, messing with the boat at the moment." GULLETT stated, "Oh, okay, alright, ten four, well I'll ah…" BUSSEY replied, "Bobby should be around there" [KENT should be around BUSSEY's residence]. GULLETT said, "Okay, I'll go see him." BUSSEY said, "Okay." [BUSSEY told GULLETT to see KENT for the methamphetamine if BUSSEY was not present when GULLETT arrived].[10]

158.   Law enforcement initiated surveillance on GULLETT and observed GULLETT travel to the area of BUSSEY's residence. Law enforcement later observed GULLETT depart the immediate area of BUSSEY's residence. Law enforcement conducted surveillance on GULLETT and initiated a traffic stop on GULLETT on Highway 90 in Marianna, Florida for a window tint violation.

159.   During the traffic stop, law enforcement had a certified narcotics canine conduct an open air sniff on GULLETT's Ford truck. The certified narcotics canine alerted to the odor of narcotics on the Ford truck.

160.   Law enforcement subsequently searched GULLETT's Ford truck and located a wood pipe with wire mesh at the end of the pipe, commonly used to smoke for the purpose of smoking marijuana (drug paraphernalia), inside the metal tool box located in the back of the Ford truck.

---

[10]   In addition, the same day, March 11, 2011, at approximately 2:58 A.M., BUSSEY, using **Target Telephone 2,** made an outgoing call to an individual at telephone number (850) 527-4568 (Call 1672). During the call, the individual said, "Hey, what's going on Mr. Lee?" BUSSEY replied, "Not much ah, I'm coming down your way. But ah Bobby's there, he's ready for you." The individual stated, "Bobby's will be there for me?" [Will KENT distribute the methamphetamine for BUSSEY]. BUSSEY replied, "Yeah he's ready for you."

161.    After the discovery of the drug paraphernalia, law enforcement attempted to pat down GULLETT prior to placing GULLETT under arrest.  GULLETT refused to be patted down and became aggressive towards law enforcement.    Law enforcement was able to secure GULLETT into handcuffs after forcing GULLETT to the ground.  GULLETT was placed into the back seat of the police vehicle and transported to the Jackson County Correctional Facility.

162.    Upon arrival to the Jackson County Correctional Facility, GULLETT was advised he would be strip-searched and there was no need to further resist law enforcement.  While in the process of removing his clothes, GULLETT voluntarily provided law enforcement clear plastic bag from his groin area that contained approximately sixteen (16) grams of suspected methamphetamine which resulted in a presumptive positive test for the presence of methamphetamine.

**11.    March 17, 2011: Delivery of Methamphetamine by BARRAGON to ROBELO-GALO and HERNANDEZ-ESTRADA to BUSSEY**

163.    On March 17, 2011, at approximately 5:30 A.M., surveillance observed established at the Stash House in anticipation of the predictable weekly delivery of methamphetamine from ROBELO-GALO to BUSSEY, at which time surveillance saw the burgundy Toyota truck and the beige Nissan Truck parked at the Stash House.

164.    At approximately 7:01 A.M., a maroon 2005 Nissan Altima, with Georgia license-plate number WX7-BNE, arrived at the Stash House (hereinafter "Nissan Altima").  BARRAGON exited the Nissan Altima and walked toward the front of the Stash House out of view.

165.    At approximately 8:44 A.M., surveillance observed HERNANDEZ-ESTRADA remove a floor jack from the bed of the burgundy Toyota truck and began jacking the rear end of the Nissan Altima.  At the same time, BARRAGON was loosening the lug nuts of the Nissan Altima with a tire iron.  Also at this time, ROBELO-GALO walked from the front-door area of the Stash House and stood near where BARRAGON and HERNANDEZ-ESTRADA.

166.    At approximately 8:52 A.M., BARRAGON removed several dark-colored packages from the right rear-wheel-well area and set them on the ground next to him, at which point ROBELO-GALO picked up the packages and carried them to the front-door area of the Stash House.

167.    BARRAGON then replaced the rear tire, and HERNANDEZ-ESTRADA lowered the Nissan Altima, removed the floor jack, and put it back into the bed of the burgundy Toyota truck.

168.    At approximately 11:25 A.M., surveillance observed HERNANDEZ-ESTRADA in the beige Nissan Truck and ROBELO-GALO in the burgundy Toyota Truck driving in tandem in Marianna. As they got close to the area of BUSSEY's residence, aerial surveillance saw HERNANDEZ-ESTRADA and ROBELO-GALO stopped in their vehicles, and ROBELO-GALO got into the beige Nissan truck with HERNANDEZ-ESTRADA.  Aerial surveillance then

followed HERNANDEZ-ESTRADA and ROBELO-GALO in the beige Nissan truck to BUSSEY's residence, where they arrived at 11:52 A.M.

169.    At approximately 12:03 P.M., aerial surveillance observed the beige Nissan truck depart BUSSEY's residence and stop on Baker Creek Road at the burgundy Toyota truck. ROBELO-GALO got out and entered the burgundy Toyota truck and both vehicles returned to the Stash House.

**12.    March 25, 2011: Delivery of Methamphetamine from ROBELO-GALO and HERNANDEZ-ESTRADA to BUSSEY**

170.    On March 24, 2011, the GPS information on **Target Telephone 3** showed that the phone, being used by ROBELO-GALO, was en-route from South Carolina to Cypress, Florida. As law enforcement continued to conduct electronic surveillance on **Target Telephone 3**, it showed **Target Telephone 3** travel through South Carolina, Georgia, Alabama, and into Florida and eventually arriving in the area of the Stash House.

171.    The same day, surveillance was established at the Stash House in an anticipation ROBELO-GALO's arrival. At approximately 2:55 P.M., surveillance observed a silver Toyota Tacoma Truck with a white camper shell and bearing South Carolina license-plate number HBD-900, arrive at the Stash House (the "Silver Toyota Truck"). ROBELO-GALO exited from driver's seat and was greeted by the HERNANDEZ-ESTRADA, who walked from the front-door area of the Stash House to the silver Toyota Truck. ROBELO-GALO and the HERNANDEZ-ESTRADA then walked to the front-door area of the Stash House.

172.    On March 25, 2011, law enforcement established surveillance at the Stash House at approximately 5:50 AM., at which time they observed the beige Nissan Truck was parked at the Stash House.

173.    At approximately 5:53 A.M., the silver Toyota truck arrived at the Stash House followed by a silver Honda Acura four-door passenger vehicle with Georgia license-plate number WX2-DDS (the "Honda Acura"). Both vehicles parked beside the beige Nissan Truck, and the drivers exited both vehicles. Because of the darkness, the drivers could not be identified.

174.    At 6:04 A.M., surveillance observed ROBELO-GALO got into the silver Toyota truck and an individual got into the Honda Acura, where the Honda Acura followed ROBELO-GALO towards Highway 231, at which point the Honda Acura continued on and ROBELO-GALO returned to the Stash House at 6:56 A.M.

175.    At approximately 7:23 A.M., ROBELO-GALO, in the silver Toyota truck, and HERNANDEZ-ESTRADA, in the beige Nissan Truck, departed the Stash House and drove to Union Road, where HERNANDEZ-ESTRADA took Union Road towards BUSSEY's residence, while ROBELO-GALO stayed in the area appearing to conduct counter-surveillance.

176. At approximately 8:22 A.M., surveillance observed the beige Nissan truck and the silver Toyota Truck and followed the vehicles to the Stash House. Based on these events, your

affiant believes that the driver of the Honda Acura delivered methamphetamine to ROBELO-GALO, who with HERNANDEZ-ESTRADA delivered the methamphetamine to BUSSEY as the weekly methamphetamine delivery.

### 13.   April 9, 2011: Delivery of Methamphetamine from BARRON to ROBELO-GALO and HERNANDEZ-ESTRADA

177.   On April 7, 2011, law enforcement conducted electronic surveillance on **Target Telephone 3**, which was being used by ROBELO-GALO. Between 7:01 A.M. and approximately 2:00 P.M., **Target Telephone 3** traveled from Greenville, South Carolina to Jackson County, Florida. Additionally, a GPS tracking device attached to the burgundy Toyota Truck further corroborated this trip.

178.   At approximately 2:48 P.M., law enforcement observed ROBELO-GALO, driving the burgundy Toyota truck, arrive at the Stash House, with HERNANDEZ-ESTRADA as a passenger. Surveillance then observed ROBELO-GALO and HERNANDEZ-ESTRADA enter the Stash House through the front door.

179.   On April 9, 2011, at approximately 6:40 A.M., law enforcement observed a maroon Chrysler PT Cruiser, bearing Alabama registration 43F87A0 arrive at the Stash House from the west ("PT Cruiser"). The driver of the PT Cruiser, later identified through a traffic stop as Ricardo Heredia BARRON, was observed kneeling down at the rear of the PT Cruiser looking underneath the PT Cruiser. At this same time, ROBELO-GALO was observed looking under the right rear area of the PT Cruiser.

180.   At approximately 6:43 A.M., BARRON backed the PT Cruiser up to the front door of the stash house, where BARRON and ROBELO-GALO were observed working near the rear end of the PT Cruiser for approximately seven minutes. Their actions were difficult to observe as they were shielded by the Stash House. During this time, HERNANDEZ-ESTRADA was also observed briefly outside near the PT Cruiser.

181.   At approximately 6:50 A.M., the PT Cruiser departed westbound on Highway 90 from the Stash House and headed north and into Alabama.

182.   At approximately 8:14 A.M., an Alabama State Trooper stopped the PT Cruiser in Abbeville, Alabama near the Hardee's Restaurant for a traffic violation (Following too closely and debris handing from the undercarriage of the vehicle). At approximately 8:25 A.M., the Trooper released BARRON. During the traffic stop, BARRON explained to the Trooper that he was coming from Daytona Beach, Florida and was headed to Phenix City, AL, where he was going to board an airplane for California.

183.   At approximately 9:35 A.M., BARRON stopped at a Citgo Gas Station, located on Highway 431 and Highway 61, where BARRON put gas into the vehicle before continuing on Highway 431. Agents followed BARRON into the Atlanta area.

14.   **April 23, 2011: Delivery of Methamphetamine Arranged by Jesus CADENAS-BAEZ to ROBELO-GALO and HERNANDEZ-ESTRADA to BUSSEY**

184.   On April 22, 2011, between approximately 6:41 A.M. and approximately 9:29 A.M., GPS data from **Target Telephone 3** and the GPS tracking device on the burgundy Toyota truck showed that this phone and this vehicle traveled from Greenville, South Carolina to the Atlanta metropolitan area. As a result, your affiant believes that ROBELO-GALO traveled from Greenville to the Atlanta-metropolitan area in the burgundy Toyota truck.

185.   After ROBELO-GALO arrived in the Atlanta-metropolitan area, at approximately 9:17 A.M., ROBELO-GALO using **Target Telephone 3** made an outgoing call to Jesus CADENAS-BAEZ at telephone number (508) 232-5178 (Call 19).[11] During the call, ROBELO-GALO said, "I'm checking the cerqulla...to see if he takes that carbon [methamphetamine] over there...I'm checking to see if that cabron arrived, I'm telling you." [ROBELO-GALO is checking with Jesus CADENAS-BAEZ to see if Jesus CADENAS-BAEZ received a shipment of methamphetamine that a courier can transport to ROBELO-GALO in Florida]. Jesus CADENAS-BAEZ said, "For sure." ROBELO-GALO replied, "Yes, I've...all...the papers [money] that's it." [ROBELO-GALO has money to pay for the methamphetamine that will be transported to him in Florida]. Jesus CADENAS-BAEZ acknowledged. ROBELO-GALO said, "I'll be down there soon ...that's it's done."

186.   At approximately 11:44 A.M., according to the GPS tracking device on the burgundy Toyota truck, it stopped near an address on Cascade Palmetto Highway SW in Atlanta, Georgia and parked there.

187.   At approximately 1:04 P.M., GPS data on **Target Telephone 3** showed that **Target Telephone 3** was on I-85 headed towards Florida. As set forth below, your affiant believes that ROBELO-GALO left the burgundy Toyota truck in the Atlanta-Metropolitan area and picked up maroon Nissan Altima, which he drove to the Stash House.

188.   At approximately 2:49 P.M., ROBELO-GALO using **Target Telephone 3** made an outgoing call to Jesus CADENAS-BAEZ at telephone number (508) 232-5178 (Call 21). During the call, ROBELO-GALO said, "He told me...the guy just called me and said that he wants to work, he said" [ROBELO-GALO has a person who wants to work as a drug courier]. Jesus CADENAS-BAEZ replied, "Oh does he want a job?" ROBELO-GALO said, "Yes." Jesus CADENAS-BAEZ asked, "When, by tomorrow?" ROBELO-GALO said, "He said tomorrow...if possible" [The person wants to courier drugs for ROBELO-GALO the next day]. Jesus CADENAS-BAEZ stated, "Alright let me see check it out and in half an hour to see what's up" [Jesus CADENAS-BAEZ will check to see if he has a load of methamphetamine ready for transport.] ROBELO-GALO replied, "Then go ahead...he just called now and he said, you

---

[11]   On May 6, 2011, United States Magistrate Judge Russell Vineyard, Northern District of Georgia issued a court order authorizing agents to obtain geo-location data (GPS) on cellular telephone (508) 232-5178. Through the GPS information, surveillance in the Atlanta area was able to identify an individual as the user of this telephone. Based upon a traffic stop of the individual and alias information from NCIC, he was identified as Jesus CARDENAS-BAEZ.

know I need to work today or tomorrow, he said" and Jesus CADENAS-BAEZ acknowledged. ROBELO-GALO continued saying, "So I told him to wait while and I'll give a call to my comarade [ROBELO-GALO checks with Jesus CADENAS-BAEZ], I told him...to, to see if he [Jesus CADENAS-BAEZ] can get you a job now or for tomorrow I told him". Jesus CADENAS-BAEZ said, "Uh-huh then let me..."

189.    The GPS data for **Target Telephone 3** showed, from approximately 5:37 P.M. through the night, the phone was in the immediate area of the Stash House.

190.    At approximately 6:08 P.M., ROBELO-GALO using **Target Telephone 3** received an incoming call from Jesus CADENAS-BAEZ from telephone number (508) 232-5178 (Call 23). During the call, ROBELO-GALO stated, "So, then what news do you have to tell me, if yes or what?" Jesus CADENAS-BAEZ replied, "Oh yes around over there early in the morning, he/they will meet . . . he/they will meet early over there, I'm saying" [A courier will deliver a shipment of methamphetamine to ROBELO-GALO at the Stash House early in the morning]. ROBELO-GALO said, "Oh Yes," and Jesus CADENAS-BAEZ said, "For sure". ROBELO-GALO said, "So do you think that tomorrow, this guy could get in?" [Does Jesus CADENAS-BAEZ think the courier will deliver the methamphetamine the following day]. Jesus CADENAS-BAEZ later said, "I don't know, listen I was unable to get that fucker's [The courier's]_number, the one from the fucking (U/I). Do you recall him [The courier]?" Jesus CADENAS-BAEZ said, "But, don't worry be patience if not tomorrow then by the day after....It'll be done later on I'll send you a cable if it is going to be possible tomorrow and (overlapping Voices)" [the courier will deliver the next day or the day after that]. ROBELO-GALO said, "So for tomorrow..." Jesus CADENAS-BAEZ replied, "...then by tomorrow..." ROBELO-GALO said, "If possible for tomorrow then is fine, then" and Jesus CADENAS-BAEZ said, "What?" and ROBELO-GALO stated, "If tomorrow (Stutter) then tomorrow call me if you come to an agreement, I'm saying." Jesus CADENAS-BAEZ replied, "Hey I'll call you". ROBELO-GALO said, "Then that's it" and Jesus CADENAS-BAEZ replied, "Alright, then that's it."

191.    On April 23, 2011, at approximately 4:45 A.M. law enforcement established physical surveillance at the Stash House and observed the beige Nissan truck was parked directly west of the Stash House and the maroon Nissan Altima was parked directly west of the beige Nissan truck.[12]

192.    At approximately 7:33 A.M., surveillance observed a metallic-gray Nissan Pathfinder (hereinafter "Nissan Pathfinder"), followed by the maroon PT Cruiser, traveling in tandem eastbound on Highway 90 and pull into the west entrance/exit at the apartment complex where the Stash House is located. The Nissan Pathfinder had Georgia registration number WX1-BIN. The Nissan Pathfinder stopped out of view in front of the Stash House, and the PT Cruiser initially pulled in front of the beige Nissan truck, before backing up in front of the beige Nissan truck.

---

[12]  When surveillance observed the maroon Nissan Altima on April 23rd, the registration has changed from when it was observed on March 17th.   Now the maroon Nissan Altima had South Carolina Registration HBE-113. According to NCIC, this vehicle's title transferred on April 18, 2011.

193.    At approximately 7:43 A.M., law enforcement observed the driver of the PT Cruiser, an unknown male, open the rear hatch on the PT Cruiser. Approximately one minute later, surveillance observed ROBELO-GALO shaking hands with the driver of the Nissan Pathfinder in front of the Stash House. A couple of minutes later, the Nissan Pathfinder departed the Stash House area.

194.    Between 7:46 A.M., and 7:47 A.M., law enforcement observed the driver of the PT Cruiser back the vehicle up to the front door of the Stash House, at which point ROBELO-GALO walked to the maroon Nissan Altima.  A few minutes later, surveillance saw HERNANDEZ-ESTRADA standing near the driver's side of the beige Nissan truck, and ROBELO-GALO opened the hood of the beige Nissan truck as HERNANDEZ-ESTRADA was walking around the beige Nissan truck.

195.    At approximately 7:57 P.M., surveillance observed ROBELO-GALO and the driver of the PT Cruiser on their knees behind the PT Cruiser, where they appeared to be working around the bumper area.

196.    At approximately 8:00 A.M., ROBELO-GALO was near the trunk of the maroon Nissan Altima, where he shut the trunk as HERNANDEZ-ESTRADA approached the beige Nissan truck and shut the hood simultaneously before ROBELO-GALO and HERNANDEZ-ESTRADA approached the driver's side of the PT Cruiser.  At approximately 8:04 A.M., all subjects were out of view and believed to be inside the Stash House.

197.    At approximately 10:21 A.M., the maroon Nissan Altima arrived at the Wal-Mart in Marianna, Florida.  When the driver went inside, law enforcement placed a GPS tracking device on the maroon Nissan Altima.

198.    At approximately 11:55 A.M., ROBELO-GALO using **Target Telephone 3** made an outgoing call to Jesus CADENAS-BAEZ at telephone number (508) 232-5178 (Call 25). During the call, Jesus CADENAS-BAEZ said, "Tell me," and ROBELO-GALO replied, "So then...is that this guy...is taking a bath, that suck man." Jesus CADENAS-BAEZ responded, "Yes he suppose to get over there . . . I thought you were hanging with them." ROBELO-GALO told Jesus CADENAS-BAEZ that he stayed over here, referring to the Stash House, and JESUS CADENAS-BAEZ said that was fine. ROBELO-GALO stated, "So tell me, do you have any news about the branches [Methamphetamine]?" Jesus CADENAS-BAEZ said, "Not yet." ROBELO-GALO responded, "Fuck this sucks...the way that's moving right?"  JESUS CADENAS-BAEZ replied, "That's right...I said that. . .the thing is low...the work is slow [It is taking longer than expected for Jesus CADENAS-BAEZ to get methamphetamine]." ROBELO-GALO replied, "Oh yes later on it may pick up." Jesus CADENAS-BAEZ replied, "Oh yes...then as soon as it leave/depart...I'll tell you...now (Overlapping Voices)." ROBELO-GALO asked, "Are we going to fuck things over?" Jesus CADENAS-BAEZ stated, "Oh sure yeah!" ROBELO-GALO laughed and stated, "That's it...don't forget to call me." Jesus CADENAS-BAEZ stated, "Oh yes as soon I know something I give you a cable or we meet." ROBELO-GALO replied, "Yes...also I wanted to tell...(Clears throat) with Juan...You'll receive twenty-five pesos" [ROBELO-GALO gave Juan CARDENAS-BAEZ $25,000 for Jesus CADENAS-BAEZ].

199.   At approximately 8:59 P.M., ROBELO-GALO using **Target Telephone 3** received an incoming call from an unknown male from Honduran telephone number 50499911349 (Call 26). During the call, the unknown male asked ROBELO-GALO where he was, and ROBELO-GALO stated, "I'm here down south" [In Jackson County]. The unknown male replied, "With my uncle [BUSSEY]?" ROBELO-GALO acknowledged. The unknown male stated, "And...and did they come . . . did Chuy come" [Did a drug courier arrive at ROBELO-GALO's location with the methamphetamine]?   ROBELO-GALO acknowledged. The unknown male said, "Ah...my uncle [BUSSEY] hasn't called you?" ROBELO-GALO stated, "No...not at all."

200.   On April 24, 2011, at approximately 1:04 P.M., ROBELO-GALO using **Target Telephone 3** received an incoming call from BUSSEY on BUSSEY's supplier phone (Call 29). The call was directed to ROBELO-GALO'S voice mail. BUSSEY left the following message, "Hey give me a call."

201.   At approximately 1:09 P.M., ROBELO-GALO using **Target Telephone 3** made an outgoing call to BUSSEY on BUSSEY's supplier phone (Call 31). During the call, BUSSEY answered the phone, and ROBELO-GALO stated, "Hey my friend you ready?" BUSSEY replied, "Yeah." ROBELO-GALO stated, "Eh...I'll be there...one hour?" BUSSEY replied, "Oh really. Okay." [ROBELO-GALO will deliver a quantity of methamphetamine to BUSSEY in about an hour].

202.   According to the GPS data on the maroon Nissan Altima, the vehicle departed the Stash House at approximately 1:27 P.M. and drove to the area of BUSSEY's residence, where it stopped on Baker Creek road close to Mill Creek Lane at approximately 1:59 P.M., which is consistent with the previous deliveries of methamphetamine, where ROBELO-GALO stopped to conduct counter-surveillance while HERNANDEZ-ESTRADA delivered the methamphetamine to BUSSEY.

203.   Law enforcement observed HERNANDEZ-ESTRADA, driving the beige Nissan truck, pull into the Stash House at approximately 2:53 P.M. and ROBELO-GALO in maroon Nissan Altima pull into the Stash House two minutes later.

204.   The GPS data for **Target Telephone 3** showed that it (and ROBELO-GALO) departed the Stash House at approximately 5:43 P.M. and drove to the Cascade Palmetto Highway SW address in the Atlanta-metropolitan area, where he and HERNANDEZ-ESTRADA picked-up the burgundy Toyota truck and both vehicles traveled in tandem to Greenville, South Carolina.

205.   On April 25, 2011, at approximately 11:35 A.M., ROBELO-GALO using **Target Telephone 3** received an incoming call from Jesus CADENAS-BAEZ from telephone number (508) 232-5178 (Call 36). During the call, Jesus CADENAS-BAEZ said, "I'm just here" [Jesus CADENAS-BAEZ is in Atlanta]. ROBELO-GALO stated, "I said that yesterday I came up north" [ROBELO-GALO was in Atlanta the night before, but drove back to South Carolina]. Jesus CADENAS-BAEZ acknowledged. ROBELO-GALO said, "I picked up the truck last night...and left last night...and then as I was going at night...I...I didn't bring any papers"

[ROBELO-GALO did not bring the drug money due to the hour he traveled]. Jesus CADENAS-BAEZ replied, "Yes...no...no that's fine then."

### 15.   May 15, 2011: Money Pick-Up and Seizure of $60,000 from ROBELO-GALO

206.   On May 13, 2011, GPS data from **Target Telephone 3** and the tracking device on the Nissan Altima showed that the telephone, used by ROBELO-GALO, and the Nissan Altima traveled from South Carolina to the Stash House.   At approximately 5:10 P.M. that day, surveillance saw ROBELO-GALO arrive at the Stash House, driving the Nissan Altima.

207.   On May 15, 2011, at approximately 7:13 A.M., surveillance saw ROBELO-GALO, driving the Nissan Altima, and HERNANDEZ-ESTRADA, driving the beige Nissan Truck, depart the Stash House.   Surveillance followed the two vehicles, which were driving in tandem, to the area of BUSSEY's residence arriving at approximately 7:40 A.M. and arrive back at the Stash House at approximately 8:36 A.M.

208.   At approximately 8:45 A.M., surveillance saw ROBELO-GALO go into the passenger side of the beige Nissan Truck and remove a black package.   ROBELO-GALO walked from the Nissan Truck into the front door of the Stash House.

209.   Over the next approximately two-and-a-half hours, surveillance observed ROBELO-GALO and HERNANDEZ-ESTRADA remove the rear passenger side tire from the Nissan Altima and work inside the rear passenger wheel well.   While working in the area passenger rear wheel well, surveillance observed both ROBELO-GALO and HERNANDEZ-ESTRADA place several black packages into the wheel well area where a possible concealed area or trap was located.   At approximately 11:34 A.M., surveillance observed ROBELO-GALO and HERNANDEZ-ESTRADA put the tire back onto the Nissan Altima.

210.   On May 16, 2011, law enforcement conducted a traffic stop on ROBELO-GALO driving the Nissan Altima in Phenix City, Alabama.   Law enforcement seized approximately $60,000 wrapped in black packages in a concealed area or trap inside the rear passenger wheel well area where law enforcement previously observed ROBELO-GALO and HERNANDEZ-ESTRADA place black packages.

### 16.   May 21, 2011 Takedown and Seizure of Methamphetamine and Cash

211.   On May 21, 2011, the GPS data from the burgundy Toyota Truck showed that the vehicle was driving south on Interstate 85 towards Florida.   At approximately 5:30 a.m., surveillance set up on Highway 431 in the area of Highway 107 in Abbeville, Alabama saw: (1) the burgundy Toyota Truck being driven by ROBELO-GALO; (2) the PT Cruiser following the burgundy Toyota Truck and being driven by a person identified, as set forth below, as Juan CADENAS-BAEZ; and (3) a Jeep Cherokee following the burgundy Toyota Truck and the PT Cruiser and being driven by a person indentified, as set forth below, as GONZALEZ-FLORES.

212.     Surveillance followed the three vehicles to the Stash House. When they arrived, the beige Nissan Truck was parked there.   Surveillance saw ROBELO-GALO, CADENAS-BAEZ and GONZALEZ-FLORES enter the Stash House. Soon after they entered the Stash House, CADENAS-BAEZ and GONZALEZ-FLORES left the Stash House in the Jeep Cherokee and were later stopped by law enforcement and arrested.

213.     Soon thereafter, law enforcement executed a search warrant at the Stash House. ROBELO-GALO and HERNANDEZ-ESTRADA were inside, and based upon arrest warrants issued by Magistrate Judge Bodiford, law enforcement arrested them.

214.     Law enforcement also searched the PT Cruiser and the beige Nissan Truck. During the search, law enforcement found approximately six pounds of methamphetamine and several ounces of marijuana in a hidden compartment in the rear bumper area of the PT Cruiser and approximately $30,000 from the beige Nissan Truck.

215.     Pursuant to arrest warrants issued by Magistrate Judge Bodiford, law enforcement then arrested later that day and the next the following people:  Lee Parker BUSSEY, JR.; Frank Eben GULLETT, JR.; Jack Allen KELLY; Cora Rebecca STONE; Rowdy Dewayne GILBERT; Mary Ann BREWER; Christopher D. GULLETT; and Bobby Jene KENT.

216.     At the time of BUSSEY's arrest, law enforcement also executed a search warrant at BUSSEY's residence.  Inside the master bedroom, law enforcement found approximately one-half of a pound of methamphetamine and a small amount of marijuana, as well as approximately $15,000.

217.     At the time of GULLETT's arrest, law enforcement seized from GULLETT's vehicle approximately 2 grams of methamphetamine from GULLETT.

218.     At the time of KELLY's arrest, law enforcement seized from KELLY's person approximately 20 grams of methamphetamine from KELLY.

219.     At the GILBERT's arrest, law enforcement seized, from a vehicle that GILBERT was a passenger in, approximately one-quarter of a gram of methamphetamine from GILBERT.

C.     **Post-Arrest Statements**

1.     **BUSSEY**

220.     Following his arrest, law enforcement read BUSSEY his *Miranda* rights, which he waived in writing and stated, among other things, the following:

- BUSSEY met ROBELO-GALO, whom he knew as Huelo and identified through a photograph, 2 ½ to 3 years ago through a friend;
- ROBELO-GALO is from South Carolina;
- BUSSEY started obtaining methamphetamine from ROBELO-GALO approximately a year ago;

- ROBELO-GALO has broken English but knows enough to conduct the drug transactions;
- BUSSEY purchases methamphetamine every week to every other week in quantities of one to two pounds;
- ROBELO-GALO charges $18,000 for one pound and $36,000 for two pounds;
- The last five purchases of methamphetamine from ROBELO-GALO, the most recent of which was last week, were two pounds, and all purchases were delivered to BUSSEY residence;
- ROBELO-GALO arrives in a tan truck with HERNANDEZ-ESTRADA, whom BUSSEY knows as Jose and identified from a photograph;
- During the methamphetamine deliveries, HERNANDEZ stays in truck, and ROBELO-GALO comes in with methamphetamine and collects the money to pay for the methamphetamine.
- ROBELO-GALO also has a burgundy truck and a maroon car;
- HERNANDEZ-ESTRADA has been driving ROBELO-GALO over in the tan truck since about March 2011;
- BUSSEY's Supplier Phone was provided to him by ROBELO-GALO; ROBELO-GALO puts the minutes on it; and it is only used to contact ROBELO-GALO about obtaining methamphetamine.
- BUSSEY profits approximately $2,500 per pound of methamphetamine that he distributes;
- BUSSEY is probably owed around $25,000 from people that he fronted methamphetamine to;
- BUSSEY distributes methamphetamine from his residence on daily basis;
- BUSSEY smokes methamphetamine on a daily basis;
- Bobby KENT has been working for BUSSEY for approximately 1 year and distributes methamphetamine on the behalf of BUSSEY or at his direction when BUSSEY is not home;
- KENT distributes methamphetamine at his residence at least three days a week when BUSSEY is not home in amounts from an "8 ball" to ½ of an ounce;
- On the day of GULLETT's arrest [in March], KENT provided GULLETT the methamphetamine at BUSSEY's residence and at BUSSEY direction;
- BUSSEY pays KENT for distributing the methamphetamine by giving KENT methamphetamine for personal use;
- GULLETT has been purchasing methamphetamine from BUSSEY for approximately 1 to 1 ½ years;
- GULLETT purchases an "8 ball" to ½ ounce of methamphetamine approximately four times a week;
- GULLETT may have purchased an ounce of methamphetamine on a couple occasions, but he could not remember;

- KELLY has been purchasing methamphetamine 2-3 times a week for approximately 1 year;
- KELLY purchases 1 gram to an ounce of methamphetamine from BUSSEY;
- KELLY last purchased ½ ounce of methamphetamine approximately 3 days ago;
- Before her arrest [in February], BUSSEY sold BREWER methamphetamine 3-4 times in the 1-2 week period before her arrest; and
- On the day of her arrest [in February], BUSSEY sold BREWER an ounce of methamphetamine for $1300.

### B.   GONZALEZ-FLORES

221.   Following his arrest, law enforcement read GONZALEZ-FLORES his *Miranda* rights, which he waived and stated, among other things, the following:

- On May 20, 2011, CADENAS-BAEZ, whom GONZALEZ-FLORES knows as "Juan" asked GONZALEZ-FLORES if he wanted to drive "crystal," which GONZALEZ-FLORES knew to mean crystal methamphetamine, from Georgia to Florida for $1,000;
- GONZALEZ-FLORES agreed to do so and made arrangements to meet with Juan CADENAS-BAEZ at a gas station in the Atlanta, Georgia area on Saturday, May 21, 2011, early in the morning;
- Juan CADENAS-BAEZ picked up GONZALEZ-FLORES at a gas station off of the highway in the early morning hours of Saturday, May 21, 2011;
- Juan CADENAS-BAEZ was driving a Jeep Cherokee;
- Juan CADENAS-BAEZ drove GONZALEZ-FLORES to a residence in a wooded area approximately ten minutes from the gas station;
- When they arrived at the residence, an unknown male, whom GONZALEZ-FLORES identified through a photograph as ROBELO-GALO, was sitting in a burgundy Toyota truck;
- There was a PT Cruiser parked at the residence;
- Juan CADENAS-BAEZ told GONZALEZ-FLORES to drive the PT Cruiser and follow ROBELO-GALO in the Toyota truck;
- GONZALEZ-FLORES entered the PT Cruiser and saw that the keys were inside of it and $1,000 was under the front seat;
- GONZALEZ-FLORES followed ROBELO-GALO;
- Juan CADENAS-BAEZ followed the CI;
- All three traveled in tandem from the residence in Atlanta to Florida where they dropped off the PT Cruiser at an apartment complex;
- Upon arriving at the Florida apartment complex, Juan CADENAS-BAEZ and ROBELO-GALO parked their vehicles and entered an apartment where there was another male;
- The CI and Juan CADENAS-BAEZ left the residence together shortly thereafter in Juan CADENAS-BAEZ's vehicle;
- GONZALEZ-FLORES left the PT Cruiser at the apartment complex;
- This was the second time that GONZALEZ-FLORES transported drugs from Georgia to Florida for Juan CADENAS-BAEZ;

- GONZALEZ-FLORES was also paid $1,000 for his first trip, which occurred in about April 2011; and
- In the April 2011 trip, GONZALEZ-FLORES and Juan CADENAS-BAEZ visited the same house as on May 21, 2011; GONZALEZ-FLORES drove the same vehicle (*i.e.,* the PT Cruiser) from Atlanta to Florida; and Juan CADENAS-BAEZ and ROBELO-GALO drove in tandem GONZALEZ-FLORES in the same vehicles that they used on May 21, 2011.

222.    Following his arrest, law enforcement read GILBERT his *Miranda* rights, which he waived and stated, among other things, the following:

- He has been a methamphetamine user for the last 2 years and uses methamphetamine 2-3 times a week;
- Approximately one year ago, GILBERT began purchasing methamphetamine from GULLETT;
- Initially GILBERT was purchasing from GULLETT ¼ ounce of methamphetamine for $450 every two weeks for approximately 2 ½ months;
- GILBERT lost his job and stopped purchasing methamphetamine from GULLETT for a couple of months;
- From January 2011 until GULLETT'S arrest [February 14, 2011], GILBERT purchased ½ gram to 1 gram of methamphetamine 2-3 times a week that he further distributed to others;
- GILBERT has not purchased any methamphetamine from GULLETT since GULLETT'S arrest;
- GILBERT purchased personal use methamphetamine approximately four times a week from GULLETT in amounts under ¼ grams;
- During general conversation, GULLETT told GILBERT that he was obtaining his methamphetamine from "Lee", which GILBERT understood to be BUSSEY;
- GILBERT only dealt with Christopher GULLETT on one occasion, when GILBERT drove a white truck to Christopher GULLETT's residence in Greenwood, Florida and gave Christopher GULLETT $100 for one gram of methamphetamine, which Christopher GULLETT has gotten from Frank GULLETT.

## VI.    CONCLUSION

224.    Based upon all of the information set forth in this Affidavit, there is probable cause to believe that Rufino ROBELO-GALO; Lee Parker BUSSEY, JR.; Frank Eben GULLETT, JR.; Jack Allen KELLY; Cora Rebecca STONE; Rowdy Dewayne GILBERT; Mary Ann BREWER; Christopher D. GULLETT; Bobby Jene KENT; Soul BARRAGON; Ricardo Heredia BARRON; Nestor Jose HERNANDEZ-ESTRADA; Jesus CADENAS-BAEZ; Octavio GONZALEZ-FLORES; and Juan Jose CADENAS-BAEZ have committed a violation of Title

21, United States Code, Section 846 and Title 18, United States Code, Section 2.

Further your Affiant sayeth not.

Michael H. Clear
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
this 23rd day of May, 2011.

LARRY A. BODIFORD
U.S. Magistrate Judge
Northern District of Florida